In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3451

ROBERT ST. PIERRE,

Petitioner-Appellant,

v.

ROGER D. COWAN, Warden,
Menard Correctional Center,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 95 C 5040--Charles P. Kocoras, Judge.

Argued March 22, 1999--Decided June 28, 2000

  Before Bauer, Flaum, and Diane P. Wood,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  Robert St.
Pierre, who has twice been convicted of a
double murder and twice sentenced to
death, cannot decide what he wants to do
about that situation. Indeed, from the
time he was first arrested for the crimes
up to and including his appeals in this
court in his federal habeas corpus
proceeding, he has flipped and flopped,
waived and withdrawn waivers, to the
point where it is practically impossible
to know what his preferences are for the
handling of his case. The narrow question
before us in this appeal is whether the
district court correctly decided that St.
Pierre had procedurally defaulted five
out of the seven claims he was raising in
his petition under 28 U.S.C. sec. 2254.
Applying the legal standards that
obtained before the passage of the
Antiterrorism and Effective Death Penalty
Act of 1996 (AEDPA), Pub. L. 104-132, 110
Stat. 1214, we conclude that St. Pierre
did not lose the right to an adjudication
of his claims on the merits. We therefore
remand the case to the district court for
further appropriate proceedings.

I

   A.  Proceedings on Conviction and
Sentencing

   The Illinois Supreme Court gave a
detailed description of the crimes for
which St. Pierre was convicted in the
first opinion it rendered in his case,
People v. St. Pierre, 522 N.E.2d 61 (Ill.
1988) ("St. Pierre I"). A summary will
suffice for our needs. On July 27, 1982,
at the request of Jackie Gibons and her
boyfriend Barry Wilson, St. Pierre
brutally murdered both of Gibons's
parents in their Skokie, Illinois, home
by bludgeoning each of them in turn with
a hammer. The next day, the three bundled
up the bodies in the trunk of the
Gibonses' car and Wilson drove off with
them, eventually dumping them somewhere
near Albuquerque, New Mexico.

   The police soon realized that foul play
was afoot when Mrs. Gibons' sister
contacted them on August 2 to let them
know that Mrs. Gibons had not been seen
at work for a few days. A detective went
to the house and found the carnage the
threesome had left behind. They also
found a belt bearing St. Pierre's name
and a number, which turned out to be his
prison identification number. (St. Pierre
had been released from prison only about
three weeks before the murders, upon
completion of a sentence for theft.)
Jackie Gibons contacted the police the
next day, August 3, and gave them a full
statement. The police promptly picked up
St. Pierre on the same day and brought
him to the Skokie police station.

   It was there, at that very first
encounter, that St. Pierre first
manifested his chronic inability to come
to a decision and stick with it. At the
time of his arrest, the police officers
read him his Miranda rights. Once at the
stationhouse, an assistant state's
attorney began his questioning with a
second reminder of his right to remain
silent. The exchange, which is set forth
in full in St. Pierre I, shows St. Pierre
informing the state's attorney at least
twice that he did want a lawyer, and two
or three sentences later just as clearly
telling the lawyer that he wanted to make
a statement right then, and then again
that he wanted to have his lawyer

present. See 522 N.E.2d at 66-67. St. Pierre then went on to give a statement admitting to his role in the two deaths.

At the trial that followed, the court denied St. Pierre's motion to suppress that statement. A jury convicted him of both murders and an assortment of other related charges, and a sentencing jury chose the death penalty. On direct appeal, the Illinois Supreme Court ruled that both the convictions and the sentences had to be set aside, because it was error to admit his confession after he had unequivocally invoked his right to counsel and the error was not harmless beyond a reasonable doubt. Id. at 68-69. At that point, the case was remanded to the Circuit Court of Cook County for retrial.

Matters had barely gotten underway at the retrial in mid-1988 before Circuit Judge Richard Neville when St. Pierre announced, through his attorney and to everyone's surprise, that he wanted to enter a blind plea of guilty. This decision so startled Judge Neville that he decided on his own to conduct a hearing to decide if St. Pierre was competent to make such a decision. At that hearing, the judge heard evidence from Dr. Albert Stipes, a staff psychiatrist at the Cook County Psychiatric Institute. Dr. Stipes opined that St. Pierre was competent to make this decision. Nevertheless, as the judge repeatedly acknowledged, the record that was building was a troublesome one. At a hearing held in August 1988, for example, St. Pierre told the court that a big part of the reason why he was pleading guilty was his dislike for the conditions at the Cook County jail. In fact, according to St. Pierre's court-appointed lawyer, Robert Barasa, St. Pierre wanted to be returned to death row while his new trial was taking place. The judge refused to issue such an order, but he recognized that there was a serious issue of competency, commenting at one point that he did not want later reviewers of the case to look at the transcript and wonder "Was Mr. St. Pierre hitting on all eight when this happened . . . ." Report of Proceedings, Transcript of Hearing of August 8, 1988 at 14. Dr. Stipes confirmed that St. Pierre had also told him that his guilty plea was motivated by his desire to escape the unpleasant

conditions at the Cook County jail. Id. at 23.

Judge Neville emphasized that he would not accept the plea if it was motivated solely by the living conditions concern, but that he would accept it if St. Pierre really meant to say he was guilty and his desire to return to Menard Correctional Institution was secondary. Id. at 32, 41-42, 103. The exchange can only be called confused yet again, but the judge eventually decided that St. Pierre was genuinely pleading guilty and he accepted the plea. Id. at 110-17. After a brief recess, St. Pierre also indicated that he wanted to waive his right to a sentencing jury. Id. at 119. While the judge was trying to describe the process to St. Pierre and to advise him of what he was waiving, the following exchange occurred among the state's attorney (Mr. Schultz), the judge, and St. Pierre:

Mr. Schultz: Your Honor, one thing as to that, defendant should be advised that their [i.e. the jury's] verdict would have to be unanimous.

The Court: And I forgot to say that, that's right, and that both as to eligibility and as to death or no death, you'd be entitled to have 12 people make that decision, and it would have to be unanimous of all the 12 people. Do you understand that?
Mr. St. Pierre: Yes, I understand that, Your Honor.

Id. at 121 (emphasis added). (The language highlighted here is important for the merits of St. Pierre's present petition; we discuss it later in this opinion.)

Almost immediately, St. Pierre's attorney attempted to withdraw St. Pierre's guilty plea: he filed a motion to that effect on August 9, but St. Pierre told the judge that the motion did not reflect his intention. Report of Proceedings, Transcript of Hearing of August 9, 1988 at 126. After again discussing the plea with St. Pierre, Judge Neville denied the motion. Id. at 134. On August 23, 1988, St. Pierre's attorney--this time at St. Pierre's direction--filed another motion to withdraw his guilty plea and then moved to withdraw the withdrawal at a hearing

on September 12, 1988. Later, St. Pierre filed more motions to withdraw the plea, on October 13, 1988, on November 7, 1988, and then again on February 14, 1989. The latter three motions were presented, however, after his sentencing hearing, to which we now turn.

Having waived sentencing by a jury, St. Pierre also decided to waive his right to have a presentence report prepared by the Probation Department. The court first heard evidence on aggravating factors and found St. Pierre eligible for the death penalty. At the mitigation stage, St. Pierre once again vacillated. At a hearing held on August 10, 1988, he had his lawyer inform the court that he wanted to waive presentation of a mitigation hearing. When the judge asked him why, he replied "I just want to proceed today. I'd just like to say one thing, a full aggravation-mitigation hearing would mean a lot more time at Cook County jail and I just want to say if this Court wants to have me go insane, go crazy, that's it." Report of Proceedings, Transcript of Hearing of August 10, 1988 at 172. The judge decided to postpone the proceedings so that Barasa could call a mitigation witness.

By the time the hearing of September 12 arrived, St. Pierre had withdrawn his request to truncate the mitigation phase and he had decided he wanted a "complete" mitigation hearing. The trial judge gave him a hearing that to some degree also included an exploration of the question whether St. Pierre was sane at the time of the offenses. (The record is quite confused, however, on whether the court regarded this issue as properly before it, and, if not, how this evidence was to be used in mitigation.) Monte Williams, a psychologist employed by the Illinois Department of Corrections, testified for St. Pierre at that hearing. His testimony, which the court eventually rejected as "ridiculous," Report of Proceedings, Transcript of Hearing of September 12, 1988 at 329, detailed St. Pierre's psychological problems and his unhappy background and suggested that St. Pierre may not have been responsible for what he did.

There was more talk of St. Pierre's mental state at a hearing on September 14, including an indication that St.

Pierre himself did not want this topic discussed. On September 19, the court, finding no mitigating factors sufficient to preclude imposition of the death penalty, sentenced St. Pierre to death for both murders. As noted above, St. Pierre responded with a blizzard of motions to withdraw his guilty plea and vacate the judgment. With the typical conscientiousness he had shown throughout these trying proceedings, Judge Neville ordered St. Pierre to submit to an additional examination by Dr. Stipes. After he received Dr. Stipes's report, he denied all the pending motions. On direct appeal to the Illinois Supreme Court, the court affirmed the convictions and sentence. People v. St. Pierre, 588 N.E.2d 1159 (Ill. 1992) ("St. Pierre II"). The court found that St. Pierre's plea of guilty had been voluntary despite his concerns about the Cook County jail, that he had been properly informed of his right to a sentencing jury and that this waiver was also valid, and that St. Pierre's other arguments were without merit.

## B. State Post-Conviction Proceedings

This pattern continued unabated through St. Pierre's post-conviction proceedings in the state courts, his petition for habeas corpus in the federal district court, and his appeal in this court. Through counsel, he filed a petition for post-conviction relief under Ill. Ann. Stat. ch. 38, para. 122 et seq. (Smith-Hurd 1992) (recodified at 725 ILCS 5/122-1), which was followed by an amended petition that St. Pierre's attorney indicated was served on October 6, 1994./1 The amended petition raised eight claims that St. Pierre's rights under the Illinois and federal constitutions had been violated by the proceedings that resulted in his conviction and sentence of death. The first of those claims was that St. Pierre was denied his rights against compulsory self-incrimination, a trial by jury, and confrontation "because he was not fit to make a waiver of his right to trial." The second claim, to which we alluded above, was that the trial judge affirmatively misled him by stating that the sentencing jury would need to be unanimous "both as to eligibility and as to death or no death." St. Pierre's petition pointed out

that unanimity is indeed required for the imposition of a death sentence, but it is not required for a jury to reject a death sentence (i.e. a lack of unanimity on one side or the other does not lead to a mistrial for the sentencing phase; it leads instead to an automatic sentence of life imprisonment). Claims three and four charged that the trial court and counsel respectively had failed to apprise St. Pierre of all the elements of the offense and of the possibility of an insanity defense before he entered his guilty plea, in violation of various constitutional rights. Claims five and six raised charges of ineffective assistance of counsel at the guilty plea and sentencing proceedings. Last, claims seven and eight made broader attacks on the constitutionality of the Illinois death penalty regime, in order to preserve them for later challenges.

St. Pierre himself signed the amended petition on a final page "verifying" the truth and accuracy of all statements in it. Shortly after his attorneys served the amended petition, however, St. Pierre filed a pro se motion directly in the Illinois Supreme Court to waive further appeals. In an order issued January 27, 1995, that court directed "the circuit court of Cook County to conduct a full and meaningful hearing within 60 days of this order to determine whether Robert St. Pierre: (1) is competent to waive further legal actions on his behalf; and (2) has made a knowing and intelligent waiver of such legal actions." Following that instruction, the circuit court convened a hearing (on March 24, April 4, and April 7, 1995), at which it heard testimony from a number of psychiatrists about St. Pierre's mental condition. Dr. Henry Lahmeyer testified that St. Pierre was suffering from bipolar disorder, and explained that bipolar disorder can affect a person's ability to make rational decisions about his future. Dr. Lahmeyer also testified that it was his opinion that St. Pierre was not fit to waive his appeals. Dr. Henry Conroe agreed that St. Pierre had bipolar disorder, and he added that St. Pierre also had a mixed personality disorder with antisocial borderline and schizotypal features. Dr. Jonathan Kelly had the same diagnosis as Dr. Conroe. After Dr. Kelly testified, the court had a brief direct exchange with St. Pierre

himself, at which time St. Pierre said:

Judge, with respect to the letter that I sent to, actually hand delivered to Dr. Kelly, with respect to my ambivalence, in all truth right now, at this point, I don't feel like I want to waive my appeals.

But I don't want to file any motions or anything to do that, because somewhere down the road I'll probably want to again.

Report of Proceedings of the Defendant's Motion to Waive his Appellate Rights, Transcript of April 7, 1995 at 153-54. The judge then pointed out that the purpose of the hearing was not to decide about waiver, but was instead to decide about capacity to waive, and he informed St. Pierre that he would have an opportunity at a later time to take further action. Dr. Stipes also testified at the hearing, and he adhered to his earlier view that St. Pierre was capable of waiving his rights. Dr. Stipes admitted on cross-examination that he had never looked to see if St. Pierre had bipolar disorder.

In an order issued April 24, 1995, the trial court concluded that although St. Pierre suffers from a psychiatric disorder, that disorder did "not interfere with his ability to make a rational decision regarding the waiver of his appeals." Memorandum Opinion at 12-13. On the other hand, the court also made the following findings:

Mr. St. Pierre has filed conflicting documents with the Supreme Court and also with the trial court. He has both asked to waive further appeals and to be executed and he has asked to in effect, suspend the waiver.

Mr. St. Pierre stated twice in open court that he still wanted to waive his appeals and be executed. After meeting with his brother, who he thought was deceased and with whom he had had no contact for several years, he stated in open court that he was ambivalent about presently waiving his appeals. However he also stated that because of the continuing incarceration he would likely waive them again in the future.

The handwritten letter to Dr. Kelly, dated April 4, 1995, also indicates a present desire to suspend at least temporarily his waiver of further appeals, and indicates meeting his brother has made him ambivalent. In the letter he states that in the future he may want to waive his appeals again.

This court finds that Mr. St. Pierre has made a knowing and intelligent waiver of his rights to further appeals, but has asked the court to suspend such waiver.

It is the respectful recommendation of this Court, that the post-conviction proceeding presently on file in the Circuit Court proceed to finality unless and until Mr. St. Pierre notifies the Supreme Court that he has made a final decision regarding his waiver of appeals.

Id. at 14-15. That was the final word from Judge Neville, who had presided over St. Pierre's case from the very beginning.

This had the effect of returning the case to the Illinois Supreme Court, which had retained jurisdiction pending the hearing it had ordered before the circuit court. On May 2, 1995, St. Pierre sent a handwritten letter to the Supreme Court (which was stamped "received" on May 4) in which, in the final paragraph, he "revivifie[d]" his requests to waive his further appeals. The very next day, May 3, he sent a second handwritten letter to the Illinois Supreme Court, in which he "ask[ed] this Honorable Court to disregard Appellant's requests to waive appeals, and apologize[d] for his ambivalence concerning these requests to waive appeals." The May 3 letter was stamped "filed" on May 11. The record then shows an Order of the Illinois Supreme Court with a file stamp of May 10 (one day before the court acknowledged its receipt of the May 3 letter) in which the court addressed both St. Pierre's pro se motion to waive further appeals and a motion filed by his lawyers to withdraw all motions to waive appeals. The court denied the motion to withdraw the waivers and it granted the motion to waive appeals, including the post-conviction proceedings, and set an execution date of September 20, 1995 (which obviously was later stayed). But the court later ruled on St. Pierre's May 3 request, through a

letter dated May 24, 1995, that stated "THE COURT HAS TODAY ENTERED THE FOLLOWING ORDER," and announced that St. Pierre's pro se motion to withdraw his motion to waive further appeals was denied.

C.  District Court Habeas Corpus Proceedings

St. Pierre, at least temporarily, continued to attempt to pursue his post-conviction challenges, through a petition his lawyers filed under 28 U.S.C. sec. 2254 in the federal district court on November 28, 1995. Once again, he flipped and flopped. On January 17, 1996, he filed a pro se motion to dismiss the petition for habeas corpus and to waive further federal review; on January 19, 1996, he asked, through his attorney, to withdraw the pro se motion to dismiss his petition (which the court allowed on July 26, 1996); on November 13, 1996, he filed another motion to waive appeals, and on December 17, 1996, the district court denied that motion; on September 29, 1997, he served up yet another motion to waive appeals, and on April 29, 1998, the district court denied that one without prejudice. The district court then issued its memorandum and order disposing of the habeas corpus petition on the merits on August 28, 1998, from which St. Pierre has taken his appeal.

In that order, the district court found that St. Pierre had exhausted his state remedies, but that he had procedurally defaulted five out of the seven claims he was attempting to raise. The defaulted claims included Claim I, in which he claimed that he was denied constitutional rights because he was not fit to waive his right to a jury trial and plead guilty; Claim II, that he was denied constitutional rights because the trial court failed to inform him of all the elements of the offense and his possible insanity defense before accepting his plea; Claim III, his similar claim regarding the elements of the offense and the insanity defense, as it related to counsel's failure to inform him; Claim IV, that he was deprived of effective assistance of counsel during the guilty plea proceedings, and Claim VI, that he was denied effective assistance of counsel during the sentencing

proceedings. The court rejected the argument that this default was excused because of St. Pierre's incapacity to waive his appeal rights, indicating that it was deferring to the state trial court's finding of competence. That left two claims that could be assessed on the merits: Claim V, which charged that the state court had affirmatively misled him about the unanimity requirement in capital sentencing in Illinois, and Claim VII, which asserted that the Illinois death penalty statute was applied in an arbitrary, capricious, and unconstitutional manner. The court found that Claim V had to be rejected on the strength of Enoch v. Gramley, 70 F.3d 1490 (7th Cir. 1995), in which this court found that an instruction that a jury would have to return a unanimous verdict in order to impose the death sentence was not constitutionally erroneous. Because this court has upheld the Illinois capital sentencing statute against similar attacks on a number of occasions, including in Williams v. Chrans, 945 F.2d 926 (7th Cir. 1991), and Silagy v. Peters, 905 F.2d 986 (7th Cir. 1990), the district court also rejected St. Pierre's seventh claim.

II

In this court, St. Pierre's alternating waivers and non-waivers have continued. After counsel filed a notice of appeal on his behalf and the appeal was docketed on September 29, 1998, St. Pierre waited a little more than two months before filing (on December 7, 1998) his first pro se motion to dismiss the case pursuant to Fed. R. App. P. 42(b). As requested by the court, counsel for both sides filed their responses to that motion on December 16, 1998. On December 21, 1998, the docket sheet indicates that "the pro se's motion to waive appeals is WITHDRAWN." Naturally, that was not the end of things. On the day this panel heard oral argument, St. Pierre once again (on March 22, 1999) filed a motion to waive his appeals. Counsel responded, and the panel elected to take the motion with the case.

Not surprisingly, counsel for St. Pierre have devoted most of their attention in his brief on appeal to the question of procedural default and to the waiver

finding that was crucial to this case. They argue first that the Illinois Supreme Court's purported finding of waiver was not an adequate and independent state ground sufficient to support a finding of procedural default, because the record was confused, the finding was wholly arbitrary, and it violated St. Pierre's due process rights. Second, based primarily on the way the Illinois Supreme Court handled the waivers of another death row inmate, Lloyd Wayne Hampton, they argue that the Illinois court has not applied its rules concerning waiver consistently and thus this is not the kind of evenhanded state procedural rule that can bar substantive review of the petition under Hathorn v. Lovorn, 457 U.S. 255, 262–63 (1982). Third, they assert that the Illinois Supreme Court's assertion of waiver failed to satisfy the standards for this kind of waiver established in Rees v. Peyton, 384 U.S. 312 (1966) (per curiam), Gilmore v. Utah, 429 U.S. 1012 (1976), and Demosthenes v. Baal, 495 U.S. 731 (1990) (per curiam). Those cases stand for the proposition that a waiver will suffice in these grave circumstances only if it is unequivocal, under oath, knowing and voluntary, and unwavering. Next, they argue that St. Pierre did establish both cause and prejudice that would excuse his defaults, noting in addition to other points that the Illinois Supreme Court's refusal to consider the May 2 and the May 3 letters together was arbitrary, led to an erroneous finding of "unequivocal" waiver, and was the kind of interference with the defendant's rights that can, and does here, excuse procedural default. Last, they argue the merits of the error in the jury instruction with respect to the unanimity requirement. On this point, they distinguish Enoch on the ground that it is one thing to tell the jury that a capital sentence must be supported by a unanimous verdict (a correct proposition of law), and quite another affirmatively to tell them that a decision not to impose the death penalty must be unanimous (an incorrect statement). Enoch involved only the former kind of statement and thus has nothing to say about St. Pierre's situation, which also involved the latter.

In our view, the district court should not have found procedural default for Claims I-IV and VI. We base this

conclusion on the totality of the record. This is not because we disagree with the state trial court's finding that at any given moment, St. Pierre could be an intelligent, well informed individual, who could understand the nature of the proceedings against him and who could cooperate effectively with counsel. Even though we are adjudicating this case under the substantive standards that applied before the effective date of AEDPA, see Lindh v. Murphy, 521 U.S. 320, 336-37 (1997), the state court's finding on a question like competency is entitled to a presumption of correctness. But there are several problems with the conclusions the Illinois Supreme Court and the district court drew from the state trial court's findings. First, the fact that a snapshot of St. Pierre's ability to function mentally showed a competent individual could not reflect the reality of his behavior over time. The state trial court itself was plainly aware of this problem, which it highlighted in its final recommendation to the Illinois Supreme Court (most of which we have reproduced above). St. Pierre had waived and withdrawn waivers so many times by then that Judge Neville drew the inevitable conclusion that St. Pierre had not yet made a "final decision regarding his waiver of appeals." The second problem relates to the inconclusive nature of the evidence on which the Illinois Supreme Court relied when it decided that the May 2 letter was the "final decision," and that the May 3 letter was to be disregarded. No later than the time when it was conducting the deliberations that resulted in the May 24 order, it knew that it had not received an unequivocal waiver from St. Pierre. And yet it arbitrarily chose to treat the May 2 letter as the dispositive document and to disregard the May 3 letter. The third problem is a more subtle one. Both the competency hearing and the subsequent orders from the state trial and supreme courts demonstrate how difficult in these circumstances it was to keep separate the question of St. Pierre's competence as an abstract matter and the question whether he had actually waived his rights.

In the final comments it made, the state trial court appears to have been trying to alert the Illinois Supreme Court to two important points: first, St. Pierre had not yet definitively waived his right

to his post-conviction proceedings and associated appeals, and second, that through some mechanism or another the Illinois Supreme Court would need to assure itself of the fact that it had a "final" decision, not one more in a series of flip-flops. The first of those two points is unassailable. As St. Pierre's lawyers point out, the only statement St. Pierre made on the record, while he was under oath in court, was "I don't feel like I want to waive my appeals." Although he said at the same time that he might later change his mind, and in one pro se letter to the Illinois Supreme Court he did so, he never retracted that statement under similarly formal circumstances, in which the court could assure itself that he understood the gravity of the move he was about to make. In fact, even after the competency hearing was over, St. Pierre filed a verified motion to withdraw his previous motions to waive his appeals.

As the Eighth Circuit pointed out in O'Rourke v. Endell, 153 F.3d 560 (8th Cir. 1998), cert. denied 525 U.S. 1148 (1999), there is an important distinction between the question whether a defendant is competent to waive a right and the question whether a given waiver is knowing and voluntary. Id. at 567. Implicit in the question of whether a waiver is knowing and voluntary is whether a waiver has actually been made. In St. Pierre's case, even if we accept fully the conclusion of the state courts that St. Pierre was competent to waive his rights (though we regard this finding as an extremely close call that we have found unnecessary to confront here), there is still the problem of the second question. The state trial court made it clear that the question of whether St. Pierre had in fact waived his appeal rights fell outside the scope of the hearing it was conducting (despite the fact that the order of the Illinois Supreme Court requiring the hearing specifically had asked the court to decide whether St. Pierre had "made a knowing and intelligent waiver"). There was never any kind of proceeding, formal or informal, at which any court was able to assure itself that St. Pierre's waiver in the May 2 letter satisfied the requirements for a knowing and voluntary waiver and that St. Pierre intended it to be a waiver. The Illinois Supreme Court

conducted no inquiry in connection with that letter. Nothing even remotely resembling the kind of procedures that are necessary to assure the validity of a waiver in analogous circumstances, such as the acceptance of a guilty plea, occurred. See Fed. R. Crim. P. 11; Brady v. United States, 397 U.S. 742, 748 (1970); see also Faretta v. California, 422 U.S. 806, 835-36 (1975) (right to counsel); Boles v. Stevenson, 379 U.S. 43, 45 (1964) (per curiam) (voluntariness of confession); Johnson v. Zerbst, 304 U.S. 458, 464-65 (1938) (right to counsel); United States v. Estrada-Bahena, 201 F.3d 1070, 1071 (8th Cir. 2000) (right to appeal); United States v. Duarte-Higareda, 113 F.3d 1000, 1002 (9th Cir. 1997) (right to jury trial); United States v. Kellum, 42 F.3d 1087, 1097 (7th Cir. 1994) (guilty plea); United States v. Bushert, 997 F.2d 1343, 1350-52 (11th Cir. 1993) (right to appeal sentence); United States v. Wessells, 936 F.2d 165, 168 (4th Cir. 1991) (right to appeal).

   Lest we be misunderstood, we hasten to add that we are not suggesting that the Constitution requires the state to adopt something equivalent to Fed. R. Crim. P. 11 for waivers of appeals or post-conviction proceedings. On the other hand, it is indisputable that the Constitution does require a waiver that literally carries with it life-or-death consequences to be made knowingly and intelligently. See, e.g., Gilmore v. Utah, 429 U.S. at 1013. In Demosthenes v. Baal, supra, the state court held an evidentiary hearing at which it resolved both the question of competence and the question whether Baal had intelligently waived his right to pursue postconviction relief. See 495 U.S. at 733, 735. At that hearing, the court was able to hear and evaluate Baal's own testimony that he did not wish to continue his postconviction hearing and that he understood perfectly what he was doing. Id. at 733.

   Here, in contrast, the Illinois Supreme Court had no idea of the circumstances under which St. Pierre wrote the May 2 letter. It took no steps, either itself or with the assistance of further proceedings in the state trial court, to assure itself that St. Pierre was making this decision unequivocally, permanently, voluntarily, and intelligently. Nor did the court reveal why it had apparently

decided that the May 2 pro se letter was a knowing, intelligent, and definitive waiver, in the face of St. Pierre's letter written 24 hours later expressing exactly the opposite preference. The last word from St. Pierre in open court had been his statement that he did not wish to waive his rights, which was what prompted Judge Neville to conclude that he had not yet made a final decision. We recognize that at the time the Illinois Supreme Court issued its May 10 order granting St. Pierre's motion to waive further appeals, the record indicates that the court did not yet know about the May 3 letter. However, before it issued its May 24 order, it knew that the factual basis on which it had proceeded for the May 10 order did not reflect the full story, and that the full story showed that St. Pierre had dispatched the May 3 retraction virtually as soon as the May 2 letter was out of his hands. Given the circumstances of this case and the history of St. Pierre's behavior, the acceptance of St. Pierre's May 2 letter as the "final" word does not meet the standards for waiver that the Supreme Court established in Gilmore and in Baal. See Whitmore v. Arkansas, 495 U.S. 149, 165-66 (1990); Drope v. Missouri, 420 U.S. 162, 182-83 (1975); see also Comer v. Stuart, 2000 WL 719454, *6 (9th Cir. 2000) ("Even if the district court finds that [the petitioner] is competent to withdraw this appeal, it must also determine the separate question of whether the purported decision is voluntary."); Mata v. Johnson, 210 F.3d 324, 331 (5th Cir. 2000) (holding if petitioner's competency to waive collateral review is in question, "the court can afford such petitioner adequate due process by [ordering a competency hearing] and, on the record and in open court, questioning the petitioner concerning the knowing and voluntary nature of his decision to waive further proceedings"). And if the waiver was not effective, it cannot serve as the basis of a finding of procedural default for purposes of federal habeas corpus proceedings. See O'Rourke, 153 F.3d at 567-69; Wilkins v. Bowersox, 145 F.3d 1006, 1011-16 (8th Cir. 1998); Johnson v. Cowley, 40 F.3d 341, 344 (10th Cir. 1994); Allen v. Alabama, 728 F.2d 1384, 1388, modified on other grounds on reh'g in part 732 F.2d 858, order corrected by 735 F.2d 1276 (11th Cir. 1984); see also

Meeks v. Singeltary, 963 F.2d 316, 320-21 (11th Cir. 1992).

We are not unsympathetic to the predicament in which both the Circuit Court of Cook County and the Illinois Supreme Court found themselves, in the face of St. Pierre's ceaseless changes of heart. This does not, however, relieve any court of the duty to ensure that a definitive waiver has occurred before it deprives the petitioner of remedies that are available under state law. (Obviously, the state has no obligation to provide appellate or post-conviction remedies, but if it has chosen to do so, due process principles apply to the terms on which these remedies must be furnished or lost. Gilmore itself involved similar post-conviction remedies, and the Supreme Court had no hesitation in holding the state to these fundamental standards.)

The same problem can arise in federal proceedings, and indeed has arisen here in the way St. Pierre has conducted himself. Although we cannot prescribe rules for the way the state courts handle such matters, we can offer suggestions to our own district courts. In circumstances similar to those we have here, the Eighth Circuit adopted an approach that quickly and efficiently puts an end to endless vacillation and allows resolution of cases. In Smith v. Armontrout, 865 F.2d 1502 (8th Cir. 1988) (en banc), the full court found that Smith, a Missouri state prisoner under a sentence of death, had effectively waived his right to appeal from a district court's judgment denying his petition for a writ of habeas corpus, even though certain next friends tried to persuade the court that it should set aside his waiver and decide the case on the merits. In a separate statement at the end of the opinion, however, the authoring judge, Judge Arnold, had this to say:

The possibility always exists that Mr. Smith may change his mind again. We direct the respondent Armontrout to deliver to Mr. Smith in person a copy of this opinion. If Mr. Smith changes his mind again, we direct the respondent Armontrout to inform the Clerk of this Court at once. The writer of this opinion believes that Smith's petition for habeas corpus, considered on its merits, is not frivolous. If Smith changes his mind

about pursuing his remedies, it is my intention to grant a certificate of probable cause and issue a stay of execution, pending determination by this Court of the appeal on its merits.

865 F.2d at 1507 n.6. Judge Arnold proved to be prescient: Smith himself did change his mind and did file a letter with the Clerk of the court "expressing his desire to prosecute the remedies provided by law with respect to each of the two convictions." Smith v. Armontrout, 865 F.2d 1515 (8th Cir. 1989). Judge Arnold followed through with his statement in the footnote and granted a certificate of probable cause and a stay of execution. Id. at 1516. Importantly for our purposes, however, were his final observations after taking that step:

. . . The various backings and fillings that have taken place in this case have made it, to say the least, less than simple. The important point for present purposes is that this Court has never passed on the merits of Smith's attack on his conviction in No. 88-2359. The District Court has decided that the attack lacks merit, but Smith has a statutory right of appeal to this Court. And, in No. 88-2702, as just remarked, no federal court has yet passed on the merits of Smith's habeas corpus petition. He is entitled to a decision on his petition under the Act of Congress that assigns habeas jurisdiction to the lower federal courts.

   Finally, I wish to add that I am not disposed to consider any further changes of mind in these cases. As far as I am concerned, Gerald Smith has made his election to proceed, and the courts should also proceed to decide the merits of his petitions with all reasonable expedition.

Id.

   In our view, the standard used by Judge Arnold in the context of granting a certificate of probable cause has much to recommend itself. There must be an end-point to a defendant's efforts repeatedly to waive and un-waive her rights. Normally, that end-point occurs when a court has before it reliable evidence that a waiver was, in the words of Johnson v. Zerbst, supra, an intentional

relinquishment of a known right, and that it was made under circumstances that drove home to the defendant the importance of what she was doing. In cases like the one the Eighth Circuit faced in Smith v. Armontrout, or in our case, not only the defendant but society as a whole has a particularly strong interest in the regularity of the proceedings that are followed; there is no un-doing a sentence of death once it is carried out. These proceedings will go forward more quickly, and they will conclude in a result recognized by all to be legitimate, if the district courts follow the presumption Judge Arnold adopted and take a retraction of a waiver as the final word. In essence, this is what we have done in this case, when we decided to take St. Pierre's latest motion to waive his appellate rights along with the case. We hereby deny that motion.

Returning to St. Pierre's case, we conclude that because the record before the Illinois courts does not establish any clear waiver from St. Pierre of his right to pursue his post-conviction remedies there, and because the May 2 handwritten letter to the Illinois Supreme Court was neither written nor filed under circumstances that assured its compliance with governing Supreme Court standards, St. Pierre's actions in the Illinois courts did not amount to procedural default for federal habeas corpus purposes. We therefore reverse the district court's decision dismissing Claims I, II, III, IV, and VI on procedural default grounds and remand those claims for a decision on the merits. We affirm the district court's decision dismissing Claim VII, for the reasons stated by that court.

Claim V requires separate consideration, and in the final analysis is an independent ground for ordering further proceedings. St. Pierre argues in his habeas petition that his waiver of a jury for sentencing was not "knowing" because Judge Neville improperly instructed him on Illinois's requirement that a sentencing jury's determination be unanimous. St. Pierre maintains that Neville's instruction left him with the erroneous impression that only a unanimous jury could prevent him from receiving a death sentence (rather than

impose a death sentence).

The district court found that St. Pierre's claim was without merit based on Enoch v. Gramley, supra. Like St. Pierre, Enoch argued that his waiver of a capital sentencing jury was invalid because he may have understood that jury unanimity was required both to impose and not to impose the death penalty. The trial court instructions in Enoch, however, differ from those at issue here. In Enoch, the trial judge explained to the defendant that in order for the death penalty to be imposed, the jury would have to return unanimous verdicts in favor of the death penalty at each stage of the proceedings. We found that the trial court's instructions were not confusing or ambiguous:

. . . The trial court's instruction to Enoch was not ambiguous. If the death penalty, as the court stated, could be given only if the jury is unanimous that it should be given, it is not reasonable to conclude that unanimity is required to avoid the death penalty.

There were only two possible decisions for the jury: impose the death penalty or decline to impose it. If unanimity is required for one and it is not achieved, the other results. To assume that Enoch unreasonably misunderstood the court's instruction would force courts to mistrust all knowing and intelligent waivers by defendants.

70 F.3d at 1506.

This case is different from Enoch. As the Enoch court pointed out, it is not reasonable to conclude from a simple instruction that unanimity is required to impose the death penalty that unanimity is also required to decline to impose it. However, Judge Neville's instruction-- unlike the instruction in Enoch--gave a choice between the two: "both as to eligibility and as to death or no death, you'd be entitled to have 12 people make that decision, and it would have to be unanimous as to all the 12 people" (emphasis added). Given this choice, it would not necessarily have been unreasonable for St. Pierre to conclude that unanimity was required to avoid the death penalty. We note as well that even if the Constitution does not require a

capital defendant to be informed of the unanimity requirement--a question we do not reach here--affirmative misinformation is an entirely different problem.

   This sort of misinformation may make a defendant's waiver of his right to a capital sentencing jury invalid. In Hall v. Washington, the petitioner's attorney advised him, prior to trial, that the difference between a jury trial and a bench trial was that "unanimity would be necessary and required in a jury setting," and, in contrast, if a judge decided the case "it would be his decision alone." 106 F.3d 742, 753 (7th Cir.), cert. denied 522 U.S. 907 (1997). No one explained Illinois's "one-juror" rule for capital sentencing, 720 ILCS 5/9-1(g), and, before the sentencing phase was to begin, his attorney merely told him that he had the right to have a "jury determination" or "a judge's determination." 106 F.3d at 753. Finding that his attorney's explanations may have misinformed or misled the petitioner about the consequences of unanimity, we concluded that the petitioner had received ineffective assistance of counsel. Id.

   The government argues that, regardless of the instruction's clarity, St. Pierre's waiver was knowing and intelligent because he had other opportunities to learn about the unanimity requirement. Although the government points to many facts that may indicate that St. Pierre did understand the unanimity requirement, it would be inappropriate for us to make such a factual finding in these proceedings. Therefore, we also remand Count V to the district court for further fact-finding.

   In summary, we Reverse the court's finding of procedural default on Counts I, II, III, IV, and VI and we Reverse the court's rejection of Count V. Those counts are Remanded for further proceedings consistent with this opinion. We Affirm the dismissal of Count VII.

/1 For unexplained reasons, the file stamp on the document from the court shows a date of February 16, 1995. The difference appears to be due to St. Pierre's unabated efforts to waive and withdraw

his waivers, as we explain in the text.