In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3480

ROBERT ST. PIERRE,

*Petitioner-Appellant,*

*v.*

JONATHAN R. WALLS, WARDEN,
Menard Correctional Center,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 C 5040—**Charles P. Kocoras**, *Chief Judge.*

ARGUED MARCH 27, 2002—DECIDED JULY 23, 2002

Before FLAUM, *Chief Judge*, BAUER and DIANE P. WOOD,
*Circuit Judges*.

BAUER, *Circuit Judge.* Robert St. Pierre committed two
brutal murders for hire in 1982. St. Pierre was tried and
convicted of the murders in Illinois state court in 1983. On
direct appeal, the Illinois Supreme Court reversed the
conviction and ordered a new trial based on the admission
of an improperly obtained confession. *People v. St. Pierre*,
522 N.E.2d 61 (Ill. 1988). On remand, St. Pierre accepted
responsibility and pled guilty to the two murders in 1989,
rather than face another trial. St. Pierre then exhausted
his state post-conviction remedies, *People v. St. Pierre*, 588
N.E.2d 1159 (Ill. 1992), and sought federal habeas relief.

The district court dismissed the petition for writ of habeas corpus finding five of the seven claims had been procedurally defaulted and the other two lacked merit. St. Pierre appealed, and we reversed the dismissal of six of the seven claims, concluding they were not procedurally defaulted. *St. Pierre v. Cowan*, 217 F.3d 939 (7th Cir. 2000). On remand, the district court granted the petition in part, as to the sentencing phase, but denied it in all other respects. *United States ex rel. St. Pierre v. Cowan*, 2001 WL 1001164 (N.D. Ill. Aug. 27, 2001). St. Pierre now appeals the partial denial of the petition, arguing that his counsel was ineffective at the pleading stage and that his guilty plea was not made knowingly and voluntarily. The State of Illinois decided not to cross-appeal the partial grant of the petition for the sentencing phase; thus, regardless of the outcome of this appeal, St. Pierre will receive a new sentencing hearing.[1] For the following reasons, we affirm the denial of the remainder of the petition for writ of habeas corpus.

## BACKGROUND

At age 19, Robert St. Pierre was involved in a brutal murder for hire scheme in 1982, just three weeks after he was paroled from prison. Subsequently, St. Pierre developed a friendship with a man named Barry Wilson. At the time, Barry Wilson was dating one Jackie Gibons. Wilson became angry with Jackie's parents, Benjamin and Sybil Gibons, because they had taken away Jackie's credit cards and no longer supplied her with cash. This caused Jackie to be unable to supply Wilson with money, and so he devised a scheme to kill her parents.

---

[1] Although, the state could again seek the death penalty in the new sentencing hearing, this is no longer a death penalty case because there is currently no such penalty awaiting the defendant.

Originally, Wilson planned on doing the job himself, and had even bought a gun. However, Wilson's attempt at murder was thwarted when he fell through a window at the Gibons' home and abruptly fled. Wilson told Jackie about the attempt and told her to clean up the mess he had made. Instead, Jackie told her parents about Wilson's attempt, and they contacted the police.

A short time later, Jackie and Wilson met with St. Pierre in downtown Chicago to discuss hiring St. Pierre to commit the murders. They discussed the method, timing, and payment in detail. St. Pierre agreed that he would kill Benjamin and Sybil Gibons for $500 up-front for each murder and $2,000 later (although as much as $10,000 was discussed). The plan called for St. Pierre to kill the Gibons at around 6 p.m. that evening.

St. Pierre later met with Jackie Gibons in an alley behind her workplace to verify that she still wanted the murders to take place. Reassured of Jackie's intent, St. Pierre went to the Gibons' home in Skokie, Illinois, at 6:30 p.m. Jackie introduced St. Pierre to her father (Sybil Gibons was not at home), and St. Pierre spoke with Benjamin Gibons for a while. Benjamin Gibons then proceeded into the kitchen and St. Pierre picked up a hammer, followed Benjamin into the kitchen and bludgeoned him to death. After Benjamin was dead, St. Pierre robbed him, taking all the money in his wallet. As planned, Jackie then called Wilson, who came over, and the three cleaned up the bloody kitchen, wrapped Benjamin Gibons's body in a plastic bag, and placed it in the master bedroom.

At 7 p.m., Detective McLaughlin called the home looking for Benjamin Gibons to follow up on investigation of the murder attempt by Wilson. Jackie told the detective that her father was out and that she would have him return the call when he came home. At approximately 7:10 p.m., Sybil Gibons called and asked Jackie to pick her up at the

Skokie Swift train station. First, Jackie drove Wilson to a hardware store to buy some plastic bags, sheets, and tape, and to a liquor store. Jackie drove Wilson back to her home, and then went to the station to pick up her mother. Upon arriving back at the home, Jackie let her mother enter the home first. As planned, St. Pierre was waiting in the hallway and he bludgeoned Sybil Gibons to death, hitting her on the head with a hammer as she walked through the front door of her own home. The killers cleaned up the blood and wrapped Sybil Gibons's body in plastic. St. Pierre and Wilson punched a hole in the wall leading to the driveway, so they could load the bodies into the trunk without being seen. St. Pierre was to accompany Wilson to dispose of the bodies in Arkansas (or California, accounts differ) and receive the rest of his money. St. Pierre then went home and waited to take the trip and collect his payment. Instead of picking up St. Pierre, Wilson drove the bodies to New Mexico where he buried them in a shallow grave.

A few days later Sybil Gibons's sister contacted the police because Sybil had not been to work for several days. A detective was dispatched to the Gibons' home and there he discovered evidence of the carnage that was not completely cleaned up by the killers. The detective also found a belt belonging to St. Pierre, bearing his name and prison identification number. The next day the police questioned Jackie Gibons and she gave the police a statement about the murders. The police then apprehended St. Pierre; Wilson was later arrested in Arizona.

St. Pierre was interviewed at the police station and given his *Miranda* warnings multiple times. Initially he wished to make a statement to the police, however, an assistant state's attorney arrived to question St. Pierre before the police could obtain a statement. A court reporter was present, and from the colloquy reprinted in the Illinois Supreme Court opinion it appears that St. Pierre wished to

make a statement, but was confused by the assistant state's attorney rehashing the *Miranda* issue. After confusing himself and St. Pierre, the state's attorney attempted to reaffirm his understanding that St. Pierre wished to give a statement without a lawyer. St. Pierre responded: "No, no. I don't want a lawyer." Thereafter, St. Pierre gave a statement where he admitted his role in the murders described above.

A. *The First Trial & Appeal*

A full and complete trial, including a mitigation hearing, was held in 1983. Initially, the defense counsel moved to suppress St. Pierre's statement on the grounds that it was taken in violation of his Fifth Amendment rights. The motion was denied. After hearing all the evidence described above, the jury convicted St. Pierre on all counts and sentenced him to death.

Although it appears that St. Pierre actually intended to waive his right to counsel, the Illinois Supreme Court found that the confession was improperly obtained. Despite the overwhelming evidence of guilt, including the testimony of co-defendant Jackie Gibons, the court focused on the effect confessions have on juries and trial strategy, and reversed, concluding that it was not harmless error to admit the confession. The case was then remanded for a new trial.

B. *The Second Trial*

The new trial began in 1988, before Cook County Circuit Judge Richard Neville. Judge Neville appointed Robert Barasa, a seasoned trial attorney and former Cook County

Public Defender,[2] as counsel for St. Pierre.[3] In the initial proceedings, a very short time after Barasa was appointed counsel,[4] St. Pierre announced his intention to plead guilty to the charges.[5]

St. Pierre's decision to plead guilty after winning on appeal struck Judge Neville as odd and he ordered a competency hearing. St. Pierre's counsel also told the judge his concern that St. Pierre might be pleading improvidently in order to avoid any further incarceration in the unpleasant conditions at Cook County Jail. Counsel for St. Pierre also suggested the examination. Judge Neville's decision was principally motivated by the intent not to create reversible error for failing to explore a potential issue.[6]

---

[2] According to his deposition Barasa had murder trial experience and had prepared an insanity defense before. These qualifications are relevant because the only issue remaining in this case is counsel's *pre-trial* (pleading stage) conduct.

[3] Outside counsel was appointed in lieu of a public defender due to the conflict created by the representation of St. Pierre's original co-defendants.

[4] According to his deposition, after being appointed counsel, Barasa discussed numerous issues with St. Pierre, including two possible defenses. "By the way, I did explain to him at length—the other interesting part—legal angle I had, which was the insanity defense . . . ."

[5] In his deposition Barasa stated: "I did talk to him numerous times about it [pleading guilty] because I was trying to talk him out of it." In addition, Barasa noted that he wanted to file motions to suppress and motions in limine, but "I couldn't file one because he wouldn't—he wouldn't—the defendant would—persisted in a plea of guilty."

[6] The dissent makes Judge Neville's decision to hold a competency hearing a lynchpin of its argument that St. Pierre's mental health problems manifested themselves clearly and Barasa
(continued...)

After the examination, Judge Neville methodically went through the consequences of pleading guilty with St. Pierre. Judge Neville emphasized to St. Pierre that he was "again cloaked with the presumption of innocence" and he had a right to a trial in which the government has the burden to prove him guilty beyond a reasonable doubt. The judge then heard testimony from an impartial psychiatrist, Dr. Albert Stipes, of the Cook County Psychiatric Institute.[7] Dr. Albert Stipes had examined St. Pierre and opined that St. Pierre was competent to stand trial.[8] Dr. Stipes stated that St. Pierre's "knowledge of the charges against him, as well as the proceedings and the duties of court personnel, are quite sophisticated."[9] Counsel for St. Pierre cross-examined Dr. Stipes on the issue of St. Pierre's problems with the living conditions at the Cook County Jail.

---

[6] (...continued)
was on notice. However, Judge Neville specifically noted that "it should be made clear in the record that *there was no general indication of any specific abnormality* on the part of Mr. St. Pierre that required me to ask for an examination." (emphasis added).

[7] Dr. Stipes, as Barasa noted in his deposition, was an *independent* "qualified health professional." (emphasis added).

[8] Dr. Stipes had examined St. Pierre three other times before, dating back to 1981. Dr. Stipes stated that he interviewed St. Pierre for one hour and reviewed the "previous material." In his 1981 report Dr. Stipes noted reviewing the defendant's previous history "available from the old reports." Among the "old reports" were undoubtably the reports of Dr. Stephen R. Cann, Judy A. Condis and the Associated Mental Health Services, all of which discuss St. Pierre's childhood psychology reports and examinations. *See infra* note 11.

[9] In his deposition, Barasa noted that, at the time, St. Pierre "knew—seemed to know exactly what was going on, knew all about guilty pleas, looked like he had his whole case set up in his mind before I even met the guy" and "he didn't appear to be insane."

Before Dr. Stipes stepped down from the witness stand, the judge asked St. Pierre if he had any questions for Dr. Stipes. St. Pierre responded in the negative.

Following the expert testimony, Judge Neville made it clear that he ordered the examination based on the unusual circumstances of the case, and "there was no general indication of any specific abnormality on the part of Mr. St. Pierre that required me to ask for an examination." Judge Neville observed that St. Pierre had meaningfully participated in the proceedings and his defense. The judge questioned St. Pierre on the issue of whether he was pleading guilty simply to return to Menard and avoid any further stay at the Cook County Jail. (St. Pierre was more than merely displeased with the conditions at Cook County; he apparently had a boyfriend at Cook County who was moved to Menard, so St. Pierre also sought to be moved back to Menard for the duration of proceedings.) St. Pierre stated, "I am pleading voluntarily." When pressed on the issue again, St. Pierre replied: "[T]o enter a plea of not guilty, okay, when in fact I did commit the crime would be tantamount to trying to get away with murder, and that's not my intention." During the discussion St. Pierre's counsel stated that he did not recommend the plea, and that he was still uncomfortable with his client's decision, but conceded that it was St. Pierre's "wish to proceed as he stated."

### 1. Acceptance of the Guilty Plea

Following this lengthy investigation and hearing, Judge Neville unequivocally concluded that St. Pierre understood his rights, options, and made the decision to plead guilty knowingly and voluntarily. Counsel for St. Pierre also stated that he explained the possible repercussions of a guilty plea to the defendant, and that death was a possible sentence. With counsel's assistance St. Pierre signed

a written jury waiver. Thereafter, St. Pierre was allowed
to plead guilty to two counts each of murder, armed robbery
and concealment of a homicide.[10]

The next day, St. Pierre's counsel filed a motion to with-
draw the plea based on the theory that St. Pierre only pled
guilty to escape further confinement at the Cook County
Jail. Before the motion was argued, St. Pierre interrupted
and emphatically stated that the motion was being made
by his attorney and against his wishes. St. Pierre's coun-
sel argued that he was obligated to file the motion be-
cause, in his opinion, a defendant should not be allowed to
plead guilty in a capital case without an agreement and
the recommendation of his attorney. Once again, Judge
Neville covered the issue of whether St. Pierre was pleading
guilty to escape the conditions of confinement at the Cook
County Jail. St. Pierre made it clear that he was pleading
guilty voluntarily and stated: "I am not pleading guilty
merely to leave the facility. That, however, is one of the
reasons. But the main reason is that I am in fact guilty of
the crime." The motion to withdraw the plea was denied.

## 2. Sentencing

St. Pierre waived his right to sentencing by a jury and the
right to a presentence report, but the judge noted that there
was a report prepared from the prior trial which could be

---

[10] However, during the plea St. Pierre refused to plead guilty to
one of the counts of armed robbery, pertaining to Sybil Gibons.
The judge read the indictment for armed robbery as being pred-
icated on the theft of Sybil Gibons' wedding ring. St. Pierre hotly
contested this fact, stating he "did not take the ring." The judge
corrected himself, finding the ring was not listed in the indict-
ment, and St. Pierre then pled guilty to the robbery count.

used.[11] St. Pierre stated that he did not want a mitigation hearing. The judge proceeded with the aggravation phase, and strongly encouraged St. Pierre to ask for a mitigation hearing. The judge even gave St. Pierre time to think about it overnight.

The next day Judge Neville again admonished him to request a mitigation hearing, and allowed St. Pierre to consider the option while the state put on evidence of aggravating factors. St. Pierre finally told his counsel that he would agree to a mitigation hearing, if it could proceed "expeditiously". The judge asked counsel if he needed any time to prepare witnesses, and counsel noted that Monte Williams, an unlicenced psychologist working for the DOC at Menard, could be a potential mitigation witness.[12]

---

[11] The Presentence Investigation Report (PSR), conducted in 1983 for the first trial, noted St. Pierre's two prior convictions for theft, his mental health and substance abuse history, and has several psychiatric summaries attached. This included the 1980 psychiatric summary prepared by Dr. Stephen R. Cann, concluding St. Pierre had no formal psychological disorders and was fit to stand trial for theft. Another summary by psychologist Judy A. Condis was also attached. This summary noted that St. Pierre was manipulative. Lastly, Dr. Stipes' 1981 evaluation was appended to the PSR. In this report Dr. Stipes also noted that St. Pierre learned to manipulate the jail system by feigning psychiatric illness. St. Pierre had cut his wrists while in the "bull pen" (holding cell) because he knew that he would be transferred out of a particular area. St. Pierre then stated he was suicidal and was put in "RTU", which Dr. Stipes noted is "safer because there are not gangs there." St. Pierre stated that he learned these tactics from other prisoners. Dr. Stipes conducted an array of tests and concluded St. Pierre was antisocial, but fit for trial and sane at the time of the theft.

[12] The dissent claims Monte Williams was unqualified and that his testimony was not beneficial. While we do not quibble with the

(continued...)

St. Pierre still wished to proceed with haste, but relented and allowed counsel time to call Williams.

At the next court appearance, counsel for St. Pierre filed a motion to have St. Pierre's sanity at the time of the crime determined. St. Pierre clearly stated that he wished to proceed with the mitigation hearing and not with counsel's motion. The rejection of this issue by St. Pierre was nothing new, counsel had previously suggested using insanity as a defense at trial, but it was squarely rejected by St. Pierre. Over St. Pierre's objections, Judge Neville allowed Williams to testify as an expert in support of the motion and in mitigation.

During the hearing Williams testified that he spoke with St. Pierre several times over the course of four years. They usually spoke about things other than the murder, which they spoke about only once, three years before Williams testified. Williams discussed his shared intellectual interests with St. Pierre, including Egyptology and writing. Williams did not bring St. Pierre's file to court because he believed confidentiality rules prohibited its disclosure, which made his testimony disjointed.[13] Williams diagnosed

---

[12] (...continued)
latter point, the record is clear that Monte Williams had significant experience in the field of psychology. Despite his unusual specialization—forensic psychology—Williams had a masters degree in counseling psychology, post-graduate training, and over fifteen years of experience in the mental health profession. Moreover, Williams had testified as an expert witness between ten and twenty times, and "used to do it on a routine basis for the Department of Mental Health in fitness for involuntary commitment hearings, chiefly, but also hearings in competency to stand trial".

[13] Williams' excuse is inconsistent with Barasa's deposition testimony. Barasa stated that he convinced St. Pierre to sign all the necessary waivers to allow the disclosure of the files. Barasa's version of events is supported by a court order.

St. Pierre as having adjustment disorder with mixed emotional features and substance abuse disorder. On cross-examination Williams conceded that such problems are surely not uncommon among prisoners. Williams also acknowledged that two licensed psychiatrists at Menard (Dr. Gupta and Dr. Vallabhaneni) examined St. Pierre and filed reports, neither concluded that St. Pierre was psychotic. Additionally, Williams did not properly state the legal standard for insanity and the state objected to his testimony on foundation grounds, so the judge found Williams could not provide an expert opinion concerning St. Pierre's sanity.

In support of the motion and as part of the mitigation evidence, defense counsel introduced another fitness report on St. Pierre, prepared for the first trial by Associated Mental Health Services. The report, composed by Dr. Braun, found St. Pierre had an antisocial personality disorder with feelings of inadequacy. The report also stated that St. Pierre's "mental status . . . [was] basically within normal limits." The report concluded: "Mr. Robert St. Pierre competent to stand trial . . . [and] [h]e understands the nature of his offense and can participate in his defense." This report was based on records and reports from Illinois Masonic Hospital, Cermack Hospital, the Department of Children and Family Services (DCFS), River Trails School, the Institute for Applied Behavioral and Psychiatric Research, J.F. Steffens and Associates, and the Illinois Department of Corrections.[14] After hearing all the evidence, Judge Neville denied counsel's motion to determine sanity at the time of the crime.

---

[14] Substantively, these are the same records St. Pierre's counsel and the dissent claim no one ever looked at prior to private counsel issuing "garden-variety subpoenas". *See supra* note 11 and *infra* notes 22-24, 26.

St. Pierre's counsel also called Father John P. Smyth, of Maryville Academy, to testify in mitigation.[15] Father Smyth testified about St. Pierre's parents, school and family experiences. The testimony of Raymond Chodorowski, St. Pierre's half-brother, from the first trial was read into the record. Chodorowski had testified about St. Pierre's early childhood and family life. Finally, St. Pierre testified describing his childhood, family life, parents, and living in a group home. St. Pierre noted his current interests in grammar, poetry, and ancient Egypt, and stated that life in prison would allow him time to accomplish certain goals. In his plea for a sentence of life in prison, St. Pierre particularly emphasized his acceptance of responsibility.

Judge Neville went through each of the statutory mitigating factors, and while he noted that St. Pierre suffered from childhood neglect and the lack of a good upbringing, these misfortunes were no excuse for the crimes. The judge noted that the crime was brutally committed in cold blood, for profit, and after the crime St. Pierre told several people he might be able to get some of the Gibons' property for them. The judge took into consideration the planning involved in the crime, the fact it was done without warning, for no defensible reason, and that there was significant waiting time between the murders of Benjamin and Sybil Gibons. The judge found that St. Pierre was not remorseful, and, in fact, he was emboldened by the enhanced status he gained in the criminal community by committing the murders. Judge Neville concluded that death was the appropriate sentence.

---

[15] Barasa also stated in his deposition that he "nose[d] around" at Maryville, attempting to find any other potential witnesses or mitigating evidence.

### 3. Post-Sentencing Motions

In 1989, St. Pierre's counsel filed a number of post-sentencing motions, and the issue of St. Pierre's mental state at the time of the murders was again raised. Judge Neville ordered St. Pierre examined again. Dr. Stipes, examining St. Pierre for the fifth time, concluded that St. Pierre was sane at the time of the murders and able to appreciate the criminality of his conduct. The motions were denied.

### C. *State Post-Conviction Proceedings*

In 1995, counsel for St. Pierre filed for post-conviction relief. At the same time, St. Pierre filed several motions *pro se* attempting to waive any further appeals. The Illinois Supreme Court appointed a guardian *ad litem* for St. Pierre, appellate counsel, and ordered a competency hearing to determine if St. Pierre was competent to waive further appeals.[16] The matter was sent to Judge Neville, and a series of hearings were conducted. St. Pierre maintained that he wished to waive any further appeals.

The guardian called a psychiatrist, Dr. Henry W. Lahemyer, to testify. Dr. Lahemyer interviewed St. Pierre for a total of two hours. Dr. Lahemyer opined that St. Pierre had an antisocial personality, suffered from bipolar disorder, and was not fit to make decisions. St. Pierre's other post-conviction counsel, five private attorneys providing services *pro bono*, called psychiatrist Dr. Henry J. Conroe

---

[16] The dissent claims the issues of mental health and bipolar disorder were "never considered by the state trial court". However, St. Pierre's mental health was the sole focus of the post-conviction proceeding outlined above. A guardian was appointed, more experts were called, and still the judge concluded that St. Pierre was *fit* to waive any further appeals.

to testify. Dr. Conroe interviewed St. Pierre for one and a half hours and reviewed prior medical records. Dr. Conroe opined that St. Pierre has a bipolar disorder as well as an antisocial personality with schizotypal features that substantially impairs his ability to make decisions and cooperate with counsel. The Cook County State's Attorney called Dr. Albert Stipes. Dr. Stipes examined St. Pierre *for the sixth time*, spoke with St. Pierre for nearly two hours, and reviewed all prior medical reports and relevant testimony. Dr. Stipes found St. Pierre has an antisocial personality with borderline features, and concluded St. Pierre was capable of waiving his rights. St. Pierre's appointed counsel called Dr. Jonathan Kelly. Dr. Kelly also examined St. Pierre and the prior records, and Dr. Kelly opined that while St. Pierre has a bipolar disorder and antisocial personality, he is capable of making rational decisions and cooperating with counsel. Based on all of the expert testimony Judge Neville concluded that although St. Pierre may suffer from a psychiatric disorder, it did not interfere with his ability to rationally decide to waive his appeals.

After the proceedings were concluded, St. Pierre, *pro se*, again sought to waive his appeals, and several days later to retract that waiver. In the time between the request for waiver and the retraction, the Illinois Supreme Court granted the motion to waive the appeals and set an execution date.

D. *Habeas Proceedings*

In late 1995, the private attorneys working *pro bono* filed for habeas relief in federal district court. The attorneys subpoenaed a number of documents relating to St. Pierre's childhood, which, according to them, show a troubled childhood and psychological problems. In early 1996, St. Pierre, *pro se*, filed a motion to dismiss the habeas petition and

waive further federal review. According to his attorneys, St. Pierre asked them to withdraw the motion two days later. The district court issued a decision dismissing the petition on the merits, finding that St. Pierre had procedurally defaulted on five of the seven claims for habeas relief. This court reversed the finding of procedural default and remanded the case. *St. Pierre v. Cowan*, 217 F.3d 939 (7th Cir. 2000).

On remand, St. Pierre asserted claims of ineffective assistance of counsel, both in the pleading stage and the penalty phase. He also challenged his own fitness to stand trial and the validity of the guilty plea. The district court granted the petition in part, as to the penalty phase, and denied the remainder of the claims.

The district court found that based on the evidence St. Pierre was fit at the time of trial and that the guilty plea was properly taken. The court concluded that counsel's services were not deficient in the pleading stage. "[N]ot open to question was St. Pierre's knowing and voluntary desire to plead guilty." *United States ex rel. St. Pierre*, 2001 WL 1001164 at *11. When it came to the penalty phase, the district court indicated that counsel had a "greater obligation to discover and evaluate potential evidence of mitigation." *Id.* *12-13. The court found that because counsel did not subpoena St. Pierre's childhood records, counsel's performance was constitutionally deficient in the penalty phase of the proceedings. "[W]e cannot say with any confidence that St. Pierre's possible bipolar [disorder] would not have changed the Judge's decision to impose capital punishment." *Id.* at *14.

## ANALYSIS

A.  *Standard of Review*

St. Pierre petitioned for a writ of habeas corpus, and our review is a narrow deferential review for constitutional

error, not an archaeological digging expedition to be conducted twenty years after the crime occurred and after numerous courts have reviewed the issues and facts firsthand. *See*, *e.g.*, *Foster v. Schomig*, 223 F.3d 626, 634 & n.4 (7th Cir. 2000) ("Given the context of the actual hearing, and *not based on what the witnesses could or could not recall thirteen years later*, not calling Dr. Rossiter was entirely reasonable.") (emphasis added); *Jones v. Page*, 76 F.3d 831, 839 (7th Cir. 1996); *Milone v. Camp*, 22 F.3d 693, 698-99 (7th Cir. 1994) ("Federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law"). The factual findings of both the state court and district courts are reviewed deferentially, including the numerous findings relating to competency. We review the district court's factual findings under the clearly erroneous standard and legal conclusions *de novo*.[17] *E.g.*, *Kavanagh v. Berge*, 73 F.3d 733, 735 (7th Cir. 1996). We presume the factual conclusions of the state courts correct if they were "made after a hearing on the merits and are fairly supported by the record," unless substantially demonstrated otherwise. *Id.*; *Rodriguez v. Peters*, 63 F.3d 546, 554 (7th Cir. 1995); *Montgomery v. Greer*, 956 F.2d 677, 680 (7th Cir. 1992).

---

[17] As we noted in the prior appeal, *St. Pierre v. Cowan*, 217 F.3d 939, 940 (7th Cir. 2000), St. Pierre's habeas petition was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. Hence, the pre-AEDPA standards (which are still deferential) apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000) (plurality opinion) (majority for Part II by O'Connor, J.). If, after receiving a new sentencing hearing, St. Pierre again files a habeas petition, AEDPA's substantially more strict standards will apply. *See Lindh*, 521 U.S. at 335-36.

B.  *Ineffective Assistance of Counsel*

  1.  *Strickland* Standard

The Sixth Amendment challenge to the effectiveness of St. Pierre's counsel is governed by the deferential standard announced in *Strickland v. Washington*, 466 U.S. 668, 684-98 (1984). St. Pierre has the burden of proving that: "counsel's performance was deficient"; and "the deficient performance prejudiced the defense". *Id.* at 687. In considering the first element, the Supreme Court has instructed courts not to engage in "the distorting effects of hindsight," and to "evaluate the conduct from counsel's perspective at the time." *Id.* at 688-91. In addition, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*; *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). In order to demonstrate the prejudice element, the defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Although St. Pierre was not tried, the *Strickland* test still applies to counsel's conduct during the pleading stage. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Jones*, 76 F.3d at 840. In the context of guilty pleas, challenged on the grounds of ineffective assistance of counsel, the first part of the *Strickland* analysis is the same; however, the prejudice requirement is altered, requiring the defendant to establish: "but for counsel's errors, he would not have pleaded guilty and *would have insisted* on going to trial." *Hill*, 474 U.S. at 58-59 (emphasis added). Yet, a lawyer need not advise his client of "*every defense* or argument or tactic that while theoretically possible is hopeless as a practical matter." *Evans v. Meyer*, 742 F.2d 371, 374 (7th Cir. 1984) (emphasis added). Just because there is no "*bona fide* defense to the charge" does not mean that coun-

sel need manufacture one. *United States v. Chronic*, 466 U.S. 648, 656-57 n.19 (1984).

2.   St. Pierre's Challenge to Counsel's Performance at the Pleading Phase

St. Pierre advances three arguments supporting his ineffective assistance of counsel claim: (1) counsel failed to investigate and obtain eight reports from St. Pierre's childhood, some of which pertain to his mental health; (2) counsel failed to have St. Pierre examined by a mental health expert; and (3) counsel failed to advise St. Pierre about the possibility of an insanity defense. St. Pierre attempts to bolster these arguments using the district court's conclusion that counsel's performance was deficient in the sentencing hearing. We discuss each of St. Pierre's argument in turn, starting with the last.

According to Robert Barasa' s deposition, he did discuss the possibility of an insanity defense with St. Pierre. St. Pierre dismissed the idea, just as he openly stated he did not want an evaluation or testimony about whether he was sane at the time of the crime during the post-trial motions and sentencing hearing.

Even if Barasa had not discussed an insanity defense with St. Pierre, that does not mean his performance was deficient. Counsel is not required to discuss every possible defense with the defendant, especially one not suggested by any evidence.[18] *See Evans*, 742 F.2d at 374. St. Pierre decided to plead guilty, against the advice of his attorney, and after a finding of competency. At the time St. Pierre pled guilty, there were *multiple* psychiatric reports available regarding his competency. Dr. Stipes tes-

---

[18] This portion of the discussion also applies to the second of St. Pierre's arguments.

tified pursuant to court order, the Associated Mental Health Services report prepared by Dr. Braun, from the first trial, was available and later used in the mitigation hearing, and the reports of Dr. Stephen R. Cann and psychologist Judy A. Condis were appended to the PSR. All of these reports, in addition to the personal observations by Barasa and Judge Neville, gave no indication of any psychological problems with St. Pierre at the time of the plea. Also, Barasa spoke with the attorneys from the first trial, who gave no indication that St. Pierre was mentally unfit at the time of the crime or first trial. Avoiding "the distorting effects of hindsight" and viewing this situation "from counsel's perspective at the time," we conclude counsel's conduct was proper under the circumstances because there were no indications of mental instability at the time St. Pierre pled guilty. *Strickland*, 466 U.S. at 689.

St. Pierre attempts to buttress the second and third arguments with the testimony of prison psychologist Monte Williams, and the two new psychological reports declaring him presently incompetent and diagnosing him with bipolar disorder. However, Monte Williams' opinion was contradicted by the report of two licensed psychiatrists at Menard. Thus, after the plea was accepted there were four qualified expert reports declaring St. Pierre in acceptable mental health, and the testimony of an unlicenced prison psychologist with no records to support his opinion, concluding St. Pierre possibly insane at the time of the crime. To include Williams' testimony—or the new reports for that matter[19]—in the calculus would be to engage in

---

[19] The dissent has clearly engaged in using the "distorting effects of hindsight", beginning with the very first paragraph where the dissent assumes the existence of "St. Pierre's mental illness". The dissent claims St. Pierre's behavior was erratic. The claimed instances of erratic behavior *began well after* St. Pierre pled guilty,

(continued...)

"the distorting effects of hindsight" because Williams did not testify until the penalty phase, and there is no testimony demonstrating that counsel was aware, or should have been aware, of Williams' opinion during the pleading phase. *Id.*

Moreover, St. Pierre cannot demonstrate prejudice based on his second and third arguments. In affidavits supporting his habeas petition, St. Pierre *now* claims that had he known about the possibility of an insanity defense he would not have pled guilty. However, the question is not what St. Pierre would do now, but what he would have done at the time had he known. *Strickland*, 466 U.S. at 694-96; *Hill*, 474 U.S. at 58-59. St. Pierre insisted on pleading guilty, despite Barasa's repeated and numerous attempts to dissuade him. Even more telling is the motion filed by Barasa to withdraw St. Pierre's guilty plea. St. Pierre interrupted the proceedings immediately after Barasa stated his intent, unequivocally stating that the motion to withdraw the plea was being filed against his wishes.[20]

---

[19] (...continued)
in the post-conviction proceedings where he attempted to waive his appeals. As noted, it appears that St. Pierre *always* wished to waive his appeals, while his attorneys attempted to convince him otherwise (or simply acted in a manner inconsistent with his wishes), creating the appearance of erratic behavior. However, St. Pierre's conduct *at the time* he pled guilty, his conduct in the prior trial, and *every* psychological report prepared up to the time he pled guilty, indicated he was participating fully in his own defense and could make rational, reasoned decisions.

[20] The dissent suggests that a guardian should have been appointed for St. Pierre. Once again, we point out there was no evidence at the time St. Pierre pled guilty and still there exists little evidence—demonstrating St. Pierre could not make rational and voluntary decisions. The dissent selectively cites a few isolated facts claiming Barasa should have declared St. Pierre incompe-

(continued...)

No matter what Barasa said or did St. Pierre intended to take responsibility for his crimes and plead guilty. Thus, St. Pierre cannot show "but for counsel's errors, he would not have pleaded guilty and *would have insisted* on going to trial." *Hill*, 474 U.S. at 58-59 (emphasis added).

Next we discuss whether counsel's failure to investigate and obtain eight reports from St. Pierre's childhood constitutes ineffective assistance. We begin by noting that counsel only "has a duty to make *reasonable* investigations." *Strickland*, 466 U.S. at 690-91 (emphasis added); *Earl v. Israel*, 765 F.2d 91, 93 (7th Cir. 1985) (holding that "if it is reasonable in the circumstances not to conduct a particular investigation, the lawyer's failure to do so will not establish ineffective representation."). Figuring importantly in this assessment is the influence of the defendant's words and demeanor, and information supplied by the defendant. *Strickland*, 466 U.S. at 690-92.

By all accounts, St. Pierre understood and actively participated in the court proceedings and his defense. Counsel spoke with St. Pierre numerous times and learned about St. Pierre's troubled childhood and background, but St. Pierre mentioned nothing about a history of mental problems. In addition, all the available medical expert eval-

---

[20] (...continued)

tent. St. Pierre's desire to leave Cook County Jail is explained by his realization that the evidence clearly showed he committed a brutal crime—which St. Pierre does not dispute—and was going to prison, the only real questions were how soon and where. The dissent's suggestion that any defendant who acts in an erratic manner must have a guardian appointed and a multiple expert competency hearing held would put our criminal justice system at the mercy of defendants who could feign mental illness—something St. Pierre is no stranger to doing—and require justice not be based on law, but on the ever evolving and changing practice of psychiatry, where experts infinitely disagree. *See supra* note 11 and *infra* note 26.

uations concluded St. Pierre was competent to stand trial and plead guilty.[21] Under the circumstances it was certainly reasonable for counsel not to conduct any further investigation into St. Pierre's childhood regarding mental competence at this stage in the proceedings. *See Jones*, 76 F.3d at 841-45; *United States ex rel. Rivera v. Franzen*, 794 F.2d 314, 316-17 (7th Cir. 1986) (noting defense attorneys have no general Sixth Amendment duty "to explore their clients' mental capacity in every case"); *Earl*, 765 F.2d at 93; *Wright v. Walls*, 288 F.3d 937, 947 (7th Cir. 2002) ("An attorney's investigation need not be unlimited in scope or unerring in execution, but merely reasonable.").

More importantly, it was St. Pierre himself who precluded counsel from even putting on a defense. Counsel cannot be considered ineffective when a competent defendant makes the informed choice not to put on a defense and instead plead guilty to the charges. *Strickland*, 466 U.S. at 690-92 ("Counsel's actions are usually based, quite properly, *on informed strategic choices made by the defendant* and on information supplied by the defendant.") (emphasis added); *Burger v. Kemp*, 483 U.S. 776, 794-95 (1987) ("'And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'") (quoting *Strickland*, 466 U.S. at 691); *Davis v. Greer*, 13 F.3d

---

[21] The dissent focuses on a few favorable facts, failing to mention not only St. Pierre's own conduct—which the dissent claims we overemphasize—but that more than four psychological reports all concluded St. Pierre was competent *before* he pled guilty. With this mountain of evidence against a finding of incompetency, Barasa cannot be faulted for failing to launch a full-scale expedition into the exploration of St. Pierre's mental workings *in the short* time between his appointment and St. Pierre's guilty plea.

1134, 1139 (7th Cir. 1994) (holding that a defendant's informed choice of strategy, precluding counsel from putting on a particular defense, cannot later constitute the basis of an ineffective assistance of counsel claim); *United States v. Weaver*, 882 F.2d 1128, 1140 (7th Cir. 1989). St. Pierre's decision also precluded Barasa from having the time to develop facts favorable to St. Pierre. Barasa first appeared on behalf of St. Pierre May 19, 1988, and less than two months later St. Pierre voluntarily pled guilty on August 8, 1988. Counsel's performance was not ineffective by failing to obtain the additional reports because St. Pierre's strategic decision to plead guilty prevented further investigation by counsel.

St. Pierre cannot demonstrate prejudice. St. Pierre's argument regarding the failure to obtain these documents is built on a number of assumptions, not the least of which is that these documents would have been admissible,[22] shown a mental disorder[23] and provided St. Pierre with an insanity

---

[22] In order for the documents to be used by the expert they must first be admissible or the expert's testimony will lack foundation. *See Pecoraro v. Walls*, 286 F.3d 439, 446 (7th Cir. 2002) ("But the facts must somehow be gotten into the record for expert testimony premised on them to be admissible."). Many of the documents are appended to St. Pierre's motion have been copied so many times that they are unreadable.

[23] The defense and the dissent claim St. Pierre suffers from bipolar disorder. Bipolar disorder cannot be diagnosed with physiological tests, instead the diagnosis is made by a psychologist or psychiatrist on the basis of observation of a number of possible symptoms and family history. *See* NAT'L INST. OF MENTAL HEALTH, DEP'T OF HEALTH & HUM. SERVICES, PUBLICATION NO. 01-3679, BIPOLAR DISORDER 6-7 (2002). Though the disorder can develop during childhood, many people do not develop the disorder until late adulthood. *Id.* at 2. Sometimes the disorder is misdiagnosed as schizophrenia. *Id.* at 5. Hence, reasonable experts could dis-
(continued...)

defense,[24] and St. Pierre would not have still pled guilty. The argument fails because many of the documents St. Pierre now claims would have changed the outcome were previously examined and noted in the Associated Men-

---

[23] (...continued)

agree as to a particular diagnosis, its overall effect on a particular person, and when it began. *See infra* note 15. Moreover, because it is so judgment and observationally based, it would be extremely difficult for a psychiatrist examining a person today to positively conclude that a person suffered from the disorder twenty years prior. Part of St. Pierre's argument is predicated on the assumption that the past diagnoses were incorrect. However, that simplistic assertion does not account for the passage of time; assuming St. Pierre is right doesn't mean that the diagnosis based on the medical science twenty years ago was wrong. Since the findings of fact were made twenty years ago and are entitled to deference, we should judge the medical findings based on a twenty-year-old standard, not one of today. *Cf. Eddmonds v. Peters*, 93 F.3d 1307, 1321 n.3 (7th Cir. 1996). Of course, all of this argumentation is an attempt to induce this court to disregard the *Strickland* standards and launch our own fact-finding expedition into mental health issues which the *defense* experts disagree on *today*.

[24] Bipolar disorder (a.k.a. manic-depressive illness) is a brain disorder which affects a person's mood. *See* NIMH, PUB. NO. 01-3679, BIPOLAR DISORDER at 2-3. A person suffering from bipolar disorder will typically have feelings of extreme highs and lows (extreme in relation to normal highs and lows of life experienced every day by people). *Id.* Applicable here, would be the symptoms of restlessness, extreme irritability, distractability, poor judgement, aggressive behavior and drug abuse. *Id.* at 4. 20-21. Over time the symptoms tend to worsen, unless treated. *Id.* at 9. Thus, St. Pierre should be even more manic today than he was twenty years ago. However, based on his *pro se* filings in federal court, St. Pierre comes off as articulate and rational when describing his current situation. As acknowledged by defense expert Dr. Kelly, a person with bipolar disorder can still be capable of rational decision making. *Id.* at 5-6, 20-21.

tal Health Services report by Dr. Braun. Even with those documents Dr. Braun concluded that St. Pierre's "mental status . . . [was] basically within normal limits." As noted before, counsel did suggest an insanity defense, which was struck down by St. Pierre, deciding to plead guilty instead. Regardless of the introduction of these documents the proceedings would not have been different.

St. Pierre attempts to parlay the district court's determination that counsel's performance was ineffective at the penalty phase into a finding that counsel's performance during the pleading phase was likewise incompetent. The two findings do create an apparent inconsistency. *Cf. Bracy v. Schomig*, 286 F.3d 406, 419-26 (7th Cir. 2002) (en banc) (Posner, J., concurring and dissenting). The inconsistency is primarily explained by the differing performance standards between trial and death penalty mitigation hearings. *See id*. at 412, 415 (majority opinion) (stating "death is different"). *See also* Jonathan P. Tomes, *Damned If You Do, Damned If You Don't: The Use of Mitigation Experts in Death Penalty Litigation*, 24 AM. J. CRIM. L. 359 (1997) (appropriately titled). In *Strickland*, the Supreme Court applied the same standard to a trial and a separate penalty hearing. *Strickland*, 466 U.S. at 684-87 ("The same principle applies to a capital sentencing proceeding"). In later cases, the Court has continued to apply the same standard to determine ineffectiveness of counsel at both trial and sentencing proceedings. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 184-87 (1986); *Williams v. Taylor*, 529 U.S. 362, 390-98 (2000) (reaffirming the Court's adherence to, and continued application of, the *Strickland* standard).

Nevertheless, this circuit has held defense counsel to a higher standard at the sentencing phase where death is a possible sentence. *See, e.g., Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989) ( "[W]e hold that defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's

fate to the jury and to focus the attention of the jury on any mitigating factors."). Even this inconsistency is potentially explained by the fact that nearly anything is admissible in mitigation, regardless of whether it would be admissible at trial. *See* 720 ILCS § 5/9-1(e) (West 2000) ("Any information relevant to any additional aggravating factors or any mitigating factors indicated in subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials."); *People v. Jones*, 447 N.E.2d 161, 165-67 (Ill. 1982) (quoting the 1979 version, which would have applied at St. Pierre's hearing, which is exactly the same standard as the current statutory version). While a defendant's mental state at the time of the crime might not rise to the level of a defense to the crime, it can be relevant in a mitigation hearing. *See* 720 ILCS § 5/9-1(c)(1) (West 2000) ("[T]he murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution"). Hence, the availability of additional evidence increases counsel's duty to investigate, within reasonable limits. *See Stewart v. Gramley*, 74 F.3d 132, 135-37 (7th Cir. 1996) ("Presumably the lawyer is not required to investigate the defendant's past with the thoroughness of a biographer.").

Of course, the availability and admissibility of practically any evidence is a double-edged sword. If counsel introduces mitigating evidence the prosecution can rebut with other evidence, which may turn out to be substantially more damaging. *See Darden*, 477 U.S. at 185-86; *Foster*, 223 F.3d at 631-39 ("As we have noted before in cases like this one, there is a strong possibility that the defendant's mitigation evidence might turn out to be aggravating."); *Emerson v. Gramley*, 91 F.3d 898, 906-07 (7th Cir. 1996) ("The narratives that defense counsel and their 'mitigation specialists' present often contain material that

the jury is likely to consider aggravating rather than mitigating."). Because of the increased investigative burden, St. Pierre's counsel could be found to have been deficient for not uncovering mitigating evidence of childhood mental illness at the penalty phase, but not be deficient for failing to present the same evidence during the pleading phase.[25]

Just about all of the cases relied upon by the district court found counsel's performance deficient in the penalty phase because counsel failed to present *any* evidence in mitigation. *See Kubat*, 867 F.2d at 368 (finding defense counsel's performance deficient by contacting only two of the known fifteen character witnesses before trial and calling *none* to testify in mitigation, relying instead on a plea for mercy); *Emerson*, 91 F.3d at 907 (affirming the grant of habeas as to the sentencing phase because "no evidence whatsoever in mitigation, or even argument, was presented."); *Brewer v. Aiken*, 935 F.2d 850, 856-58 (7th Cir. 1991) (finding that counsel's failure to investigate and present *any* mitigating evidence at the sentencing

---

[25] The dissent makes a second assumption that seems fatal to its own argument, that St. Pierre's claimed mental illness was so severe as to prevent rational decision making. And the dissent, throughout its opinion, seems to confuse the evidence of a mental illness and the evidence of a mental illness which impairs rational decision making. The two are clearly distinguishable. St. Pierre's supposed mental illness might have an effect on a judge or jury during a mitigation hearing, but only a severe, debilitating mental illness could make St. Pierre incompetent if proved to a judge or jury. Moreover, only two of the new expert reports prepared by defense counsel support the dissent's assumption, while yet another defense expert found St. Pierre's mental illness *did not* interfere with his ability to make rational decisions. *See infra* note 26. (Not to mention the *nine* other reports or examinations, *all of which* concluded that St. Pierre was able to make rational and voluntary decisions. *See supra* notes 11, 22-24 and *infra* note 26.)

phase prejudiced the defense); *Antwine v. Delo*, 54 F.3d 1357, 1365-68 (8th Cir. 1995) (upholding the conviction but finding counsel ineffective at the sentencing phase for failing to present evidence of defendant's mental illness and presenting *only* a plea for mercy); *see also Patrasso v. Nelson*, 121 F.3d 297, 303-05 (7th Cir. 1997). In contrast, St. Pierre's counsel presented significant evidence in mitigation, including three live witnesses (Monte Williams, Fr. Smyth, and St. Pierre), testimony by stipulation (Raymond Chodorowski), and the Associated Mental Health Services report. These witnesses provided substantially all of the same evidence regarding St. Pierre's childhood experiences that St. Pierre now asserts is in the reports and would have made the difference if it was investigated and introduced. *See Darden*, 477 U.S. at 185-87 (finding counsel's decision not to introduce a psychiatric report and instead rely on a plea of mercy was reasonable); *Foster*, 223 F.3d at 631-39 (holding that counsel's performance was not ineffective for deciding not to call an expert to testify about defendant's mental state because it might do more harm than good); *Stewart*, 74 F.3d at 135-37 (finding attorney's failure to fully investigate defendant's history of drug use or potential brain damage was not ineffective assistance of counsel because the additional evidence would not have made a difference).

Simply because there is additional evidence of a rough life, deprived childhood, or mental instability does not necessarily make it less likely the death sentence will be imposed. Historical facts that show a defendant has a condition or proclivity toward violence are often aggravating, not redeeming or mitigating factors. *See Stewart*, 74 F.3d at 139 ("And since it obviously is not the theory of capital punishment that murderers are compelled to murder by their past and therefore should not be punished, it cannot be right that anything brought out at a death-penalty hearing is certain or even likely to help the defen-

dant to save his life."); *Brewer*, 935 F.2d at 860-61 (Easterbrook, J., concurring) (noting that "[t]rying to persuade the jury that the accused is mentally ill is worse than no defense at all."). Judge Neville, after considering mitigating evidence similar to that which St. Pierre now proffers and the brutality and nature of the crimes, concluded the death penalty was the appropriate sentence.

Counsel for St. Pierre wanted to put on a defense at trial, and even sought to withdraw the guilty plea. It was St. Pierre who made the decision to plead guilty to the charges. Several psychologists, the judge, and counsel all agreed that he was competent to do so. Based on all the available evidence at the time of the plea and the *Strickland* standard, it is impossible to say that counsel's performance was deficient. In fact, counsel's overall performance at the pleading stage, considering his client's attitude and intent, was commendable. *See Balfour v. Haws*, 892 F.2d 556, 562-63 (7th Cir. 1989) (noting that for specific allegations of ineffective assistance courts must "weigh the overall quality of representation provided to the defendant" and not individual shortcomings). The district court's conclusion, finding counsel's performance did not fall below objective standards of reasonableness, was correct.

## C. *Knowing and Voluntary Guilty Plea*

St. Pierre's argument that his plea was not knowing or voluntary directly relates to the prior discussion of counsel's performance because St. Pierre argues that counsel failed to advise and provide him with information making his plea involuntary. *See Hill*, 474 U.S. at 56-59 (applying the *Strickland* analysis when a defendant challenges the voluntariness of a plea based on inadequate advice of counsel); *McMann v. Richardson*, 397 U.S. 759, 770-72 (1970) (holding counsel's advice regarding evidence and potential success at trial versus a guilty plea is judged

"not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases."). However, St. Pierre's burden is even more onerous in this analysis for four reasons. First, counsel advised St. Pierre not to plead guilty and urged St. Pierre to go to trial. Second, counsel told St. Pierre about two possible defenses, one being insanity and the other being the admissibility of St. Pierre's statements. Third, St. Pierre was found competent to plead and clearly actively participated in the proceedings. Finally, we deal with a guilty plea by a defendant who is, without a doubt, guilty of the crime; and "the concern that unfair procedures may have resulted in the conviction of an innocent defendant is only rarely raised by a petition to set aside a guilty plea." *Hill*, 474 U.S. at 58 (internal quotations and citations omitted).

A guilty plea is properly accepted if it is made voluntarily and intelligently. *E.g.*, *Boykin v. Alabama*, 395 U.S. 238, 242-44 (1969). Voluntariness is determined by "considering all of the relevant circumstances surrounding" the guilty plea. *Brady v. United States*, 397 U.S. 742, 749 (1970). During the process of accepting the plea the defendant must be made aware of the consequences of a guilty plea, however, he need not be made aware of every possible consequence. *See Boykin*, 395 U.S. at 242-44; *Brady*, 397 U.S. at 748; *United States v. Jordan*, 870 F.2d 1310, 1316 (7th Cir. 1989); *United States v. Lumpkins*, 845 F.2d 1444, 1450 (7th Cir. 1988); *United States ex rel. Salisbury v. Blackburn*, 792 F.2d 498, 499-501 (5th Cir. 1986).

St. Pierre does not argue that the judge improperly advised him of all the consequences of his guilty plea. St. Pierre cannot and does not challenge his competency to enter the plea because Judge Neville held a hearing on the issue of competence before accepting the guilty plea and the state judge's finding of competency is entitled to

deference.[26] *See Montgomery*, 956 F.2d at 680 (holding the state court's finding of competency is a factual one which we presume correct); *Balfour*, 892 F.2d at 560; *cf.* 725 ILCS 5/104-10 (providing the statutory presumption of fitness of a defendant to stand trial, plead, or be sentenced). *See also Gosier v. Welborn*, 175 F.3d 504, 507 (7th Cir. 1999) (noting involuntariness of a plea is often a derivative argument of competency).

Rather, St. Pierre asserts that his plea was neither knowing nor voluntary because he did not have the eight records from his childhood—later uncovered by private habeas counsel—and he did not know of the availability of an insanity plea. However, lawyers need not inform their clients of every possible defense, argument, or tactic, especially one not suggested by any evidence *at the time. Evans*, 742 F.2d at 374-75. Moreover, "'[i]t is well settled that a voluntary and intelligent plea of guilty made by an

---

[26] The fact remains that more than twenty years ago in 1980, 1981, 1982, and 1983, St. Pierre was found competent after examination by numerous licensed psychiatrists. There are three reports appended to the PSR, two others from the first trial, and four more submitted or discussed in the second trial. Out of all those reports only one, that of the unlicenced prison psychologist Monte Williams, concluded St. Pierre had any serious psychiatric disorders. Thirteen years later, in 1995, four more reports were submitted. Two defense psychiatrists found a serious psychiatric disorder which would impair St. Pierre's ability to cooperate with counsel, but one of the defense psychiatrists disagreed with that assessment, and another psychiatrist found him competent. There is little doubt that after St. Pierre has spent all this time in prison, his mental state could have significantly deteriorated. However, it is temporally and logically difficult to argue with the multiple psychiatric reports which found St. Pierre competent nearly twenty years ago. In addition, if evidence of St. Pierre's current abilities is important we should note that St. Pierre has submitted, *pro se*, remarkably well written and reasoned documents during the federal proceedings.

accused person, who has been advised by competent counsel, may not be collaterally attacked.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Mabry v. Johnson*, 467 U.S. 504, 508 (1984)).

The facts most indicative of a knowing and voluntary plea are directly drawn from St. Pierre's own participation in the proceedings. Both Judge Neville and counsel stated that St. Pierre knew what he was doing and had meaningfully participated in the proceedings and his defense. St. Pierre staunchly contested a minor issue of fact, related to the robbery count and Sybil Gibons's ring, until it was resolved to his satisfaction. Following a comprehensive hearing, Judge Neville concluded that St. Pierre knew his rights and made the voluntary decision to plead guilty. And when counsel filed a motion to withdraw the plea, St. Pierre interrupted to make it clear that the motion was being made by counsel and against his wishes.

St. Pierre was advised not to plead guilty, and about the possibility of using insanity as a defense. He flatly rejected the option of going to trial, and according to Judge Neville he did so knowingly and voluntarily. St. Pierre was found competent, and as the judge noted, appeared to meaningfully participate in his defense. Additionally, counsel noted that St. Pierre understood the charges and clearly wanted to plead guilty. Today St. Pierre says he wouldn't have pled guilty. However, hindsight is expressly prohibited in our analysis. *See Hill*, 474 U.S. at 56-59; *Strickland*, 466 U.S. at 688-91. All the facts show that he understood the decision he was making and voluntarily made it because he wanted to accept responsibility for his crimes. There is no evidence indicating that the plea was not knowing and voluntary.

## CONCLUSION

After previously being found guilty of two murders by a jury, Robert St. Pierre decided to forgo another trial

and accepted responsibility and willingly pled guilty, knowing that death was a possible sentence. The facts are replete with examples where St. Pierre wished to do something (plead guilty or waive an appeal) and judges and attorneys, using all the persuasive ability they could muster, attempted to change St. Pierre's mind, creating the appearance of inconsistency. Despite this advice and pressure, St. Pierre consistently wanted to plead guilty, accept responsibility, and accept his sentence, knowing the consequences. The fact that he chose to accept responsibility might seem to some to be unusual, but it does not automatically make him incompetent, unable to cooperate with counsel, or his counsel ineffective for failing to persuade him to go to trial. The denial of the petition for writ of habeas corpus is therefore, AFFIRMED.

DIANE P. WOOD, *Circuit Judge,* dissenting. The majority's opinion affirming the district court's Solomonic decision to deny Robert St. Pierre's petition for a writ of habeas corpus, insofar as it related to his conviction (and to grant the petition insofar as it related to his death sentence) does the best that can be done with the facts surrounding the quality of the legal assistance St. Pierre received from his attorney throughout the proceedings. Unfortunately, in my opinion it is not enough to warrant the affirmance of the denial of the petition with respect to St. Pierre's guilty plea. As has been the case throughout the legal proceedings in St. Pierre's case, see, *e.g.*, *St. Pierre v. Cowan*, 217 F.3d 939 (7th Cir. 2000), St. Pierre's mental illness—its nature, its severity, its effect on his crime, its

effect on his ability to assist in his own defense, and its impact on his sentence—is a central problem. In a case where mental illness is or may be present, we must set aside our normal assumptions about human behavior and rationality of decisionmaking, and instead consider what occurred in light of the effects of any illness on the defendant's actions. When one does so in St. Pierre's case, I believe we are left with no choice but to grant the petition in its entirety.

**I**

Although the majority has given a full account of the facts of St. Pierre's crime, it has omitted certain information about the course of proceedings in the state courts that I find highly pertinent. We begin, however, on common ground: shortly after the two murders were committed, the police arrested St. Pierre, and he was charged with two counts of conspiracy to commit murder, two counts of armed robbery, and two counts of concealing a homicidal death. He went to trial before a jury on these charges, upon the conclusion of which the jury found him guilty and sentenced him to death. The Illinois Supreme Court reversed that conviction and remanded the case for a new trial, on the ground that inculpatory statements St. Pierre made at the Skokie (Illinois) police station following his arrest were improperly admitted into evidence after St. Pierre had invoked his right to counsel.

The majority has also recounted most of the pertinent details about St. Pierre's retrial, which took place in 1988 before Circuit Judge Richard Neville, but it is here that I believe additional information helps to throw light on the problem before us. Judge Neville appointed Robert Barasa to represent St. Pierre. The majority characterizes Barasa as a "seasoned" trial attorney and former Cook County Public Defender, but neglects to mention

that, no matter how seasoned an attorney Barasa was for ordinary criminal cases, he had never before had primary responsibility for a capital case. It is telling in that regard that the Report of the Governor's Commission on Capital Punishment, April 2002,[1] includes among its recommendations several pertaining to the qualifications for counsel in capital cases, including an endorsement of new rules from the Illinois Supreme Court that creates a specialized Capital Litigation Trial Bar (membership in which requires prior experience as lead or co-counsel in at least two murder prosecutions) and further requires that lead counsel in all capital cases be a member of that bar. See Ill. S.Ct. Rules 416(d), 714(b). My point here is certainly not that these rules are retroactive; it is only that thoughtful people throughout the State of Illinois, including the members of the state Supreme Court and the members of the Governor's Commission, have recognized the importance of prior experience for defense counsel in capital cases. Someone like Barasa who lacks such experience is thus a novice to the capital area, no matter how much he has done elsewhere.

Very shortly after these new proceedings began, to everyone's astonishment, St. Pierre announced that he intended to enter a blind plea of guilty to all charges. With commendable caution, Judge Neville decided that this rather bizarre decision (especially considering the fact that St. Pierre's inculpatory statements could no longer be used) warranted a competency hearing. Judge Neville found further reason for a hearing when he learned from Barasa that St. Pierre's motivation for his planned guilty plea lay in his abhorrence of the conditions at Cook County

---

[1] This report has received wide national attention and has been disseminated throughout the country. It is available electronically at http://www.idoc.state.il.us/ccp/ccp/reports/commission_reports.html.

jail and his desire to return to the state prison. In connection with the competency proceedings, the court ordered that St. Pierre be examined by Dr. Albert Stipes, a staff psychiatrist at the Cook County Psychiatric Institute; Dr. Stipes was to look into St. Pierre's fitness to plead guilty, to be tried, and to be sentenced. As the court put it, he wanted to be sure that "Mr. St. Pierre [was] hitting on all eight" when he entered his blind plea. That same day, August 8, 1988, Dr. Stipes conducted a one-hour interview of St. Pierre and reviewed the records of a psychiatric examination from March 1981, in which St. Pierre's mental fitness had been assessed for purposes of a theft charge. Nothing else was brought to Dr. Stipes's attention, although records documenting St. Pierre's mental health existed dating back as far as St. Pierre's childhood. (The majority speculates that Dr. Stipes may have seen these particular "old" records, *ante* at 7 n.8, but there is nothing at all in the record to support this conjecture.) Dr. Stipes concluded that St. Pierre was fit for pleading, trial, and sentencing, yet at the same time he acknowledged that St. Pierre was pleading guilty to escape the intolerable conditions at Cook County jail.

Upon hearing Dr. Stipes's opinion, Barasa did nothing to discredit the ultimate finding of fitness. He did not mention to the court, for example, that he knew that St. Pierre had attempted suicide in the Cook County jail, nor did he otherwise alert the court to the fact that there were serious questions about St. Pierre's mental and emotional health. Furthermore, even though Dr. Stipes's opinion was unfavorable to his client, Barasa did not seek permission to have another mental health professional evaluate St. Pierre. All he did was highlight St. Pierre's desire to leave the Cook County jail, but he failed to link this desire to any mental illness. After hearing all this, Judge Neville pointed out that his only reason for ordering the examination was the oddness of St. Pierre's sudden

desire to plead guilty. The judge ruled that St. Pierre was indeed competent to proceed.

Even then, however, Judge Neville's concern is apparent in the record. He decided to engage in a colloquy with St. Pierre himself, to ensure that the plea was not motivated solely by the jail problem. The judge reminded St. Pierre of his right to a trial before a jury or the court and stated that he would not accept a guilty plea if St. Pierre had not in fact committed the crimes with which he was charged. St. Pierre then acknowledged that he was pleading guilty against the advice of his lawyer, but he said that as long as he was at Cook County jail it was not worth fighting the case. At that point, the following statements were made:

> Barasa:  [I]t is the defendant's wish to plead guilty because of his inability to deal with his incarceration at County Jail where he is right now, and that if he could be transferred to a location within County Jail, anywhere where he could be away from some of the, apparently he's told me that there's gangs, there's homosexuality, there's drugs, there's weapons, and that these factors upset him so much that he cannot, to him it is not worth it to fight this case . . . .

> St. Pierre:  [I]f it were possible that I could spend my time, okay, during the proceedings of this case in the penitentiary, maximum security penitentiary, and I would be more than willing, okay, to assist my attorney, okay?

The trial court rejected these requests and told St. Pierre that his only option was Cook County jail; at the same time, the judge again reiterated that he would not accept a plea of guilty unless St. Pierre was really admitting he was guilty of the crimes.

During these discussions, it is at best disputed whether anyone told St. Pierre that one of the rights he would be giving up if he pleaded guilty was the right to raise an insanity defense, and that if he raised that defense, the state would have the burden of proving his sanity beyond a reasonable doubt. In his deposition, Barasa claims that he did so, but nothing on the record reveals this. In the end, however, this is not an important dispute. If St. Pierre is really mentally ill, it is hard to say how valuable such advice would have been in any event—how reliable are the decisions of someone who is operating within a delusional system? If St. Pierre is not really mentally ill, then the analysis suggested by the majority might be applicable. But the key question is the way *Barasa* was handling the issue of mental illness, not the way St. Pierre might have been responding to questions posed to him. As the majority notes, in the end the court accepted the blind plea, and St. Pierre waived his right to a sentencing jury.

The very next day, August 9, 1988, Barasa filed a motion on St. Pierre's behalf seeking to withdraw the guilty plea. The stated grounds related, not surprisingly, to St. Pierre's motivation for the plea: it argued that his only reason for pleading was to obtain release from Cook County jail. St. Pierre himself indicated to the court that he did not agree with Barasa's motion and that he did not want to withdraw the plea, because withdrawal would mean more time in Cook County jail. The court denied Barasa's motion because of St. Pierre's opposition to it. The state then presented evidence in aggravation without any objection from Barasa. That evidence included his prior theft convictions, an attempt to escape confinement in 1983, and the grisly manner in which the Gibons murders were carried out. The court was then prepared to schedule a date for St. Pierre to present mitigating evidence. Initially, St. Pierre objected, but he ultimately agreed upon

a hearing date within three weeks (later extended slightly to September 12).

At the September 12 mitigation hearing, Barasa filed a motion to have St. Pierre examined to determine his sanity at the time of the crime; he explained to the court that his motion was based in part on a discussion he had with Monte Williams, an employee of the Illinois Department of Corrections who held a master's degree in psychology but was not a licensed psychologist. Barasa had Williams with him to serve as a witness on the question of St. Pierre's sanity. Despite the majority's effort to portray Williams as a credible witness, it is clear that he was not. Judge Neville, on the record, branded Williams's testimony as "ridiculous," noting that Williams did not seem to understand the legal standard for insanity:

> [W]hen he was asked what the issues of insanity were . . . he said that it had to do with whether the defendant was a danger to himself and whether he was a danger to society. That, of course, is a self-commitment issue, which is what [Williams] says he's been doing for years, and what he's most familiar with, and has nothing to do with the issues before me in this courtroom.

This was no surprise to anyone who had been listening to Williams's description of his own credentials. When asked what he did, Williams claimed that he specialized in "forensic psychology and the area where psychology comes together with anthropology and archaeology." (One wonders how he managed to combine these three rather different disciplines; perhaps he assessed sanity by using ancient Native American artifacts in some kind of tribal ceremony, while he observed the patient's affective response.) Before the St. Pierre proceeding, Williams had never before testified on the issue of sanity at the time of a criminal offense. Moreover, he did not try to compen-

sate for his lack of background by unusual preparation for the hearing.[2] To the contrary, he did not bring St. Pierre's file to the court and he had never formally examined St. Pierre. Instead, according to him, he had chatted with St. Pierre from time to time while St. Pierre was incarcerated at Illinois's Menard prison, discussing common interests such as Egyptology! Tellingly, Barasa had also made no effort to procure the file.

As already noted, Judge Neville was unimpressed with Williams's contribution. The judge told Barasa that it was the obligation of the defense to raise the issue of insanity with enough evidence to convince the court that there was something substantial to address. Even so, the judge was willing to listen to Williams insofar as his testimony might bear on mitigation. Williams opined that St. Pierre was not responsible for his actions based on vague psychological problems and an unhappy background. Finally, and rather remarkably, Williams concluded his testimony by analogizing St. Pierre's mental condition to the mental condition of the "entire nation of Germany" prior to the rise of Adolph Hitler, who was a person (according to Williams) "who most people think was insane, and whom we know wasn't." At one point in this unsatisfactory proceeding, Barasa openly admitted to the court that he was not prepared for the hearing and that he had not realized how severe the burden was for some-

---

[2] The majority has made a Herculean effort to rehabilitate Williams and to paint him in a credible light, *ante* at 10-11 n.12, but the facts speak for themselves. Specifically, it remains true that Williams was not a licensed psychologist, that he had never conducted a professional examination of St. Pierre, and that he had never before testified on the issue of a defendant's sanity, as opposed to the question whether a person should be committed. It is hard in light of all that to question Judge Neville's evaluation of Williams's contribution.

one introducing a defense based upon sanity. Judge Neville appropriately chastised Barasa for being woefully unprepared. In the end, as the majority has noted, the court denied Barasa's motion to determine St. Pierre's sanity at the time of the offense.

That left very little in the way of mitigation evidence. Barasa introduced a transcript from St. Pierre's half brother, and testimony from Father John Smyth of the Maryville Academy, where St. Pierre had spent a significant part of his childhood. Father Smyth testified about some of St. Pierre's school and family experiences. The court also admitted by stipulation a report filed in 1983 by the Associated Mental Health group on St. Pierre's fitness to stand trial. Last, St. Pierre took the stand to describe his background, including his father's alcoholism, his mother's inability to set boundaries, and his ultimate shipment to a group home. The court found that none of the mitigating factors sufficed to lessen St. Pierre's culpability; it also explicitly found that "there has been no testimony that St. Pierre ever suffered from mental disease or defect"; and it sentenced him to death.

In February 1989, in post-trial proceedings, the court agreed to revisit the issue of St. Pierre's sanity. St. Pierre agreed to be re-examined by Dr. Stipes, who once again reviewed the same records he had looked at earlier, to which he added the Williams testimony. Once again, even after the passage of this much time, Barasa had never conducted a background investigation, he never subpoenaed records from institutions like Maryville, nor had he tried to have St. Pierre examined by another qualified expert.

On direct review, the Illinois Supreme Court affirmed St. Pierre's conviction and death sentence, and the U.S. Supreme Court denied certiorari. Now represented by new counsel, St. Pierre began state post-conviction proceedings. These proceedings were disrupted, as we explained

in detail in *St. Pierre v. Cowan*, *supra,* by St. Pierre's inability to decide whether or not he wished to pursue them or to waive all further review. Eventually, the Illinois Supreme Court ordered the circuit court of Cook County to conduct a hearing on St. Pierre's competence to waive further appeals. Only then did his psychological record begin to come into focus. New counsel introduced school records that identified St. Pierre as hyperactive, noted his destructive behavior, and described his "negative" home environment. In this context, "negative" was if anything a euphemism: one of the records stated that St. Pierre's father encouraged St. Pierre to kill his mother. Early psychological testing at Maryville indicated that St. Pierre had uncontrolled destructive behavior, that he suffered from depression, anxiety, and that he had a "phobic nature." Most importantly, counsel introduced testimony of several psychologists who all diagnosed him as afflicted with bipolar disorder.[3] Dr. Louis Hemmerich, Ph.D., a licensed clinical psychologist affiliated with Great Lakes Psychological Services, was of this opinion; Dr. Hem-

---

[3] The National Institute of Mental Health gives the following definition of bipolar disorder: "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in a person's mood, energy, and ability to function. Different from the normal ups and downs that everyone goes through, the symptoms of bipolar disorder are severe. They can result in damaged relationships, poor job or school performance, and even suicide. . . . Bipolar disorder typically develops in late adolescence or early adulthood. However, some people have their first symptoms during childhood, and some develop them late in life. It is often not recognized as an illness, and people may suffer for years before it is properly diagnosed and treated. Like diabetes or heart disease, bipolar disorder is a long-term illness that must be carefully managed throughout a person's life." National Institute of Health Publication No. 01-3679 (updated Mar. 7, 2002), at http://www.nimh.nih.gov/publicat/bipolar.cfm.

merich also determined that St. Pierre "may not have been fully able to conform his conduct to the requirement of the law at the time of the commission of the crimes with which he had been charged." Dr. Henry Lahmeyer (professor of psychiatry at Northwestern University), Dr. Henry Conroe (board-certified forensic psychiatrist), and Dr. Jonathan Kelly, also all concluded that St. Pierre had bipolar disorder. Unlike Dr. Stipes, or even the "ridiculous" Williams, these doctors all had access to the full record of St. Pierre's history, including the documents from his time at Maryville. Dr. Stipes testified again that he thought St. Pierre was capable of waiving his right to further legal proceedings, but on cross-examination he admitted that he had never, at any time over the years, looked into the question whether St. Pierre had bipolar disorder.

St. Pierre's new counsel, who continue to represent him before this court, made it clear that they had been able to obtain the important background information about St. Pierre from "garden-variety" subpoenas issued to the schools and institutions at which St. Pierre had spent time.

Because of the confusion over the question whether St. Pierre was waiving post-conviction remedies, Judge Neville never ruled on the post-conviction petition.[4] After our remand, however, the district court reviewed the claims that St. Pierre had not procedurally defaulted. It granted his petition only with respect to Claim VI, which was the one in which St. Pierre claimed that he was denied his Sixth Amendment right to effective assistance of counsel during his capital sentencing proceeding. Claim VII had dropped out of the case after we affirmed the district court's

---

[4] That means, despite the fact that St. Pierre's mental health had received consideration in the earlier state court proceedings, that it was *never* evaluated in the light of the full record we now have before us.

earlier dismissal of that claim. The other claim on which I wish to focus at this point is Claim IV, which argued that St. Pierre was also denied his right to effective assistance of counsel at the guilty plea stage.

## II

St. Pierre's original petition for a writ of habeas corpus was filed prior to the passage of the Antiterrorism and Effective Death Penalty Act ('AEDPA'), and thus this appeal is governed by the standards applied prior to AEDPA's enactment. *St. Pierre v. Cowan*, 217 F.3d at 940. Although, as the majority emphasizes, our review of facts found by the state courts is deferential, we review issues of law *de novo,* including the critical questions whether he received ineffective assistance of counsel during his guilty plea proceedings and the adequacy of that plea. *Cabello v. United States*, 188 F.3d 871 (7th Cir. 1999). Here, of course, the state court never had the chance to make any findings of fact on the underlying issue of St. Pierre's mental illness because of the way Barasa was handling the proceedings. In any event, it is the Sixth Amendment issue (as applied to the states through the Fourteenth Amendment) that is properly before us. That question, as the majority notes, is governed by the Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984).

Under *Strickland*, St. Pierre has the burden of showing both that his counsel's performance fell below the minimum level that the Constitution tolerates and that he was prejudiced by the inadequate performance. In the context of a guilty plea, this means that he must prove that the assistance he received leading up to the plea fell below the constitutional minimum and that he would not have entered the plea had he been adequately represented. See *Hill v. Lockhart,* 474 U.S. 52, 56 (1985). The majority finds St. Pierre's case insufficient, largely because it

has assumed that St. Pierre was in fact competent to participate actively in the court proceedings that led to his guilty plea. It finds significant the fact that St. Pierre himself never mentioned his mental health problems. But there is a troubling circularity to this logic: a mentally ill person may not have the capacity to self-diagnose a problem of mental illness; he may be operating within a delusional system; he may believe himself to be some kind of super-man; and so on. No one would expect a blind person to give a vivid description of a painting she is near, nor would one expect a person with a severe hearing impairment to discuss knowledgeably the performance on a particular evening of the cello section of the Chicago Symphony Orchestra. Everything St. Pierre did and said in the trial proceedings leading up to, and following, his guilty plea, is suspect because of the compelling evidence of mental illness that post-conviction counsel have uncovered. What we must consider is whether Barasa's failure to find the same information amounted to inadequate performance, and then, if so, whether that inadequate performance prejudiced St. Pierre.

St. Pierre's current lawyers point to Barasa's failure to conduct even a rudimentary background investigation of his client as one of his primary errors. As the Fifth Circuit put it in a case decided under the pre-AEDPA standards, "[w]here counsel (1) makes some exploration of the insanity defense but fails to take an obvious and readily available investigatory step which would have made the defense viable, (2) does not produce reasonable tactical reasons for not pursuing further investigation, and (3) raises no other plausible defense, courts may find ineffective assistance of counsel." *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987). (This court later observed that *Profitt*'s conclusion, as something developed under pre-AEDPA standards, did not apply in the post-AEDPA context, because the Supreme Court has never had occasion to

consider this issue. See *Long v. Krenke*, 138 F.3d 1160, 1164 (7th Cir. 1998). As St. Pierre's case is governed by pre-AEDPA law, however, the constraint that the *Long* court found does not apply here.)

In my opinion, the record overwhelmingly shows that Barasa's performance was constitutionally insufficient during the course of the proceedings that led to St. Pierre's guilty plea, as well as in the proceedings before the trial court after the guilty plea. He admitted at the first sanity hearing that he was unprepared and unaware of what it took to put into play a serious sanity defense. By the time of the second hearing, which Judge Neville conscientiously offered, Barasa was *still* grossly unprepared. He had not issued so much as a single subpoena to find out what St. Pierre's mental health history really was. He chose to rely on the "ridiculous" Williams as his only witness—and we have no reason to second-guess Judge Neville's impression of Williams's testimony. The utter failure to look into pertinent information cannot be accepted as a strategic choice. The Supreme Court noted in *Strickland* itself that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 691. Here, the issue of St. Pierre's mental functioning had been called into question by the trial court judge himself; it is hard to imagine a better clue to defense counsel that this is a topic he too ought to exert at least some effort to explore.

The state argues that Barasa's actions fell within the range of acceptable professional competence because St. Pierre was so eager to plead guilty. But, once again, that argument suffers from the fallacy of assuming the answer to the very question presented: could St. Pierre make such an important decision? Just because a child is eager to cross the street when a traffic light is still red does not mean that a parent relents and gives her permission for

the child to step out into on-coming traffic. If a mentally ill person persistently asked for a rope in his cell, the custodian obviously would not furnish one. It was up to Barasa, St. Pierre's representative, to make some inquiry into his mental health and the potential for either defenses or mitigation arguments based on that health, without uncritical deference to St. Pierre's demands. Although the majority insists there was no evidence that St. Pierre had a mental disorder,[5] as our earlier opinion made clear, St. Pierre was displaying precisely the kind of erratic, irrational behavior that accompanies bipolar disorder.[6] If what the state really means to argue is that there

---

[5] It is unclear to me why the majority believes that it has the expertise to make a definitive conclusion (a) about St. Pierre's mental health, and (b) about the effect it may have had on his proceedings (two issues that I certainly recognize to be distinguishable). We are not expert psychiatrists or psychologists; all we can do is to ensure that the proceedings that led to a result are worthy of confidence. Here, I cannot say that they were, because of the ineffective assistance of counsel St. Pierre received. As this dissent explains, I believe that the case should be retried with proper assistance of counsel, through which the trier of fact would have full information from qualified experts about St. Pierre's mental condition and its consequences for the crime and the proceedings. Once the experts have made such a judgment, I would be happy to abide by whatever conclusion they reached.

[6] The NIMH pamphlet on bipolar disorder lists the following signs or symptoms of mania, or a manic episode:

- Increased energy, activity, and restlessness

- Excessively "high," overly good, euphoric mood

- Extreme irritability

- Racing thoughts and talking very fast, jumping from one idea to another

(continued...)

was nothing about St. Pierre to tip Barasa off to the fact that there might be a problem, the record convincingly refutes such a position.

Barasa knew that St. Pierre had won his first appeal and had succeeded in obtaining an order from the Illinois Supreme Court requiring suppression of his jailhouse confession; he knew that St. Pierre was willing to be sentenced to death rather than to await trial in the Cook County jail; he knew that St. Pierre had attempted suicide; and he knew that the trial judge felt that St. Pierre's decisions were troubling enough that someone needed to make sure he was "hitting on all eight." If one wanted to take Williams into account (which I think is unnecessary), Barasa also knew that Williams thought St. Pierre was mentally ill. This is ample knowledge on his part to take routine investi-

---

[6] (...continued)

- Distractibility, can't concentrate well

- Little sleep needed

- Unrealistic beliefs in one's abilities and powers

- Poor judgment

- Spending sprees

- A lasting period of behavior that is different from usual

- Increased sexual drive

- Abuse of drugs, particularly cocaine, alcohol, and sleeping medications

- Provocative, intrusive, or aggressive behavior

- Denial that anything is wrong

NIMH report, *supra* note 2, page 2. The report goes on to note that delusions can accompany severe episodes of mania or depression. *Id.*

gatory steps such as gathering together readily available records and seeking permission to have his own expert psychiatrist, with full access to St. Pierre's mental health history, conduct a thorough examination of St. Pierre. Barasa's failure to do so constituted ineffective performance, in my opinion.

Before a writ can be granted on the basis of a Sixth Amendment violation, it is of course also necessary to consider the question of prejudice. In my opinion, St. Pierre has also demonstrated this. First, had his bipolar disorder come to light before Judge Neville (whose own decisions were certainly hampered by Barasa's failure to develop the record properly), it is possible Judge Neville might have appointed a guardian to act for St. Pierre, rather than permitting him to make his own decisions. Such a guardian might have thought St. Pierre ought to have a full trial, rather than pleading guilty. Even if St. Pierre had remained in charge and had pleaded guilty, it is also quite likely that the evidence of the bipolar disorder that was eventually developed (and never considered by the state trial court because of the procedural mix-ups that have plagued this case) would have influenced the court's decision on the penalty phase. These cases are fact-specific, and for that reason I am not persuaded that the Eighth Circuit's decision in *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), based on a situation with many similarities to St. Pierre's, is dispositive on the prejudice question. The (probable) severity of each man's disorder, the knowledge counsel had of the probable existence of mental abnormalities, the effect the disorder may have had on the commission of the offense, the effect it was having on the defendant's ability to assist in his own defense, and many other factors are different in the two cases. In any event, Antwine had insisted that he was interested only in the kind of defense that would produce an acquittal, whereas St. Pierre might also have benefitted at the penalty phase.

To the extent that we should listen to St. Pierre, it is also notable that St. Pierre never rejected Barasa's efforts to argue that he was insane at the time of the offense. Twice Barasa tried to make this argument, and St. Pierre raised no objection at either point. He even permitted a second evaluation by Dr. Stipes after Barasa filed the post-trial motion. This too suggests that it was not St. Pierre who was preventing the competent exploration of this topic; it was Barasa.

The district court in St. Pierre's federal habeas corpus proceedings also concluded that Barasa's failures were irrelevant because "under Illinois law, St. Pierre's sanity at the time of the crime was not an essential element of the crime." While correct as far as it goes—sanity at the time was an affirmative defense, as codified by Section 6-2(a) of the Criminal Code of 1961—the ultimate conclusion of no prejudice is mistaken. In 1982, when St. Pierre committed this crime, the law pertaining to insanity defenses was as follows: the defendant had the initial burden of introducing evidence on the question of sanity; if he did so, the defendant was no longer presumed to be sane, and the state had the burden of proving sanity beyond a reasonable doubt. See *People v. Hollins*, 482 N.E.2d 1053, 1055 (Ill. 1985). Although by 1988 Illinois had changed that rule, and now imposes the burden on the defendant to prove by a preponderance of the evidence that she was not guilty by reason of insanity, see Pub. Act 83-288, Ill.Rev.Stat. 1983, ch. 38, par. 6-2(e); *People v. Hickman*, 492 N.E.2d 1041 (Ill. 1986), St. Pierre was plainly entitled to have the 1982 version of the law applied to his case. As the Illinois courts themselves have recognized, to do otherwise would amount to an *ex post facto* application of the new statute. *People v. Ramsey*, 735 N.E.2d 533, 535 (Ill. 2000). In the end, therefore, it does not matter whether St. Pierre's sanity was formally an "essential element" of the case or an affirmative defense. What does matter is

the fact that the state would have borne the burden of proving his sanity beyond a reasonable doubt, had Barasa properly raised the defense. This in turn shows once again that Barasa's shortcomings were prejudicial to St. Pierre at the guilt phase of his case.

Last, there is a problem in the state's argument that St. Pierre cannot show prejudice because (it predicts) the insanity defense would not have prevailed at trial. If all the jury had heard was the testimony of Dr. Stipes, who never even looked to see whether St. Pierre had bipolar disorder, or worse yet, the testimony of both Dr. Stipes and Williams, that may be correct. But that really is another way of providing prejudice from Barasa's failure to create a proper record, not a way of showing lack of prejudice. If the trier of fact had seen everything that post-conviction counsel have uncovered, there is a reasonable probability that the result at trial would have been different.

For all these reasons, I would reverse the district court's decision denying St. Pierre's petition for a writ of habeas corpus with respect to the guilt phase of his case, and I would find that St. Pierre is entitled to a full new trial. As the state has not contested the district court's grant of the writ with respect to the sentencing phase of the proceedings, like the majority I make no separate comment on that aside from the observation that all the shortcomings I have documented provide firm support for the district court's ruling.

I respectfully dissent.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*